Eugene PIERCE, Plaintiff–Appellee,

v.

The ATCHISON TOPEKA AND SANTA FE RAILWAY CO., d/b/a Santa Fe Railroad Co., Defendant–Appellant.

No. 96–2403.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1997.

Decided March 27, 1997.

H. Nicholas Berberian (argued), Robert J. Kuker, Neal, Gerber & Eisenberg, Chicago, IL, for Plaintiff–Appellee.

J. Stephen Poor (argued) and Alicia Wiltz, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellant.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Twice a jury has concluded that a release signed by Eugene Pierce in favor of his former employer, Santa Fe Railroad Co. ("Santa Fe"), did not constitute a knowing and voluntary waiver of his rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. On review of the first such conclusion, this court acknowledged that ADEA rights could be relinquished through a knowing and voluntary waiver and held that whether a waiver was knowing and voluntary should be determined by looking to the totality of the circumstances surrounding the waiver. 65 F.3d 562, 571 (7th Cir.1995). In addition, we held that "after the employer raises the existence of a release as a defense to a discrimination suit, the burden rests on the plaintiff to challenge specifically his voluntary and knowing consent to the release." Id. at 572. We noted that, although "the court instructed the jury that Santa Fe had to prove that Pierce's execution of the release was knowing and voluntary, . . . it is clear that neither the parties nor the court reflected upon whether that requirement encompasses the totality-of-the-circumstances inquiry." Id. Moreover, it was not "apparent whether Pierce ever asserted that his consent to the release was not knowing and voluntary." Id. We therefore remanded with instructions to determine whether Pierce's consent was knowing and voluntary under the totality of the circumstances. On remand, the jury once again found that Pierce's waiver was not knowing and voluntary. We now affirm.

## I.

The underlying facts are presented at length in our first opinion, but we will briefly recount them here. In July 1989, Santa Fe fired Pierce from his job as a Senior Analyst, a nonunion position to which Pierce had climbed the previous year after working for more than a decade in various union posts.

At the time, the railroad offered Pierce a $19,000 severance package, conditioned on his signing a general release of all claims against Santa Fe. Pierce rejected the offer and chose instead to exercise his union seniority rights, which enabled him to secure a position as a file room clerk. His woes continued, however, for after only two days, a more senior employee took Pierce's job and relegated him to the role of assistant file room clerk. Unwilling to accept Santa Fe's explanation that a reduction in force had necessitated the elimination of his Senior Analyst position, Pierce filed claims of age and race discrimination with the EEOC in October 1989.

In November, hearing rumors that his department was to relocate from Illinois, Pierce approached George Pacocha, a Santa Fe official, about receiving a severance package. Pierce had learned from his fellow workers that Santa Fe had offered other union employees a "360" package and he was curious to know whether he was eligible.[1] Pacocha initially responded that he would have to check with his superiors; when the two men subsequently met on either the Tuesday or the Wednesday before Thanksgiving, Pacocha told Pierce that he could receive the severance package provided that he signed by day's end a general release of all claims against Santa Fe. At this point, Pierce informed Pacocha of the EEOC complaint and asked whether the release would preclude the discrimination claims. Pacocha responded that he did not believe the release would bar Pierce's claims, and gave Pierce until the following business day (either Wednesday or Monday) to decide whether to sign it and accept the severance package.

When the two men next met, Pacocha again advised Pierce of the legal consequences of his signing the release. Exactly what Pacocha told Pierce at this second meeting is a matter of considerable dispute, but the result of the meeting was that Pierce accepted the severance package and signed the release, which included the following terms:

---

1. The 360 package or program was so called because it entitled recipients to 360 days' worth of pay.

For and in consideration of the sum of $36,871.20, subject to the usual deductions, the receipt of which is hereby acknowledged, I hereby knowingly and voluntarily resign from the service of The Atchison, Topeka and Santa Fe Railway Company.

I understand and agree, in consideration of the above specified amount, that this voluntary resignation constitutes a complete relinquishment and surrender unto said Railway Company, of any and all my rights including seniority, Health and Welfare, and other rights and benefits which may heretofore have accrued to me as an employe[e] of said Railway Company.

I further understand that this voluntary resignation constitutes full settlement and release of any and all claims of any nature, known or unknown, which I have or might have against said Railway Company, including, but not limited to, claims which derive from or are based on any aspect of my preceding employment relationship with said Railway Company or my resignation of such employment.[2]

Despite having signed this release, Pierce filed suit against Santa Fe in June 1991 upon receiving notice from the EEOC of his right to sue.

At the first trial, the jury found that the release did not bar Pierce's claims, found that Santa Fe had discriminated against Pierce on the basis of age, awarded him back pay, and doubled this award based upon a finding of willful discrimination. *See* 65 F.3d at 567. Acting in its advisory capacity, the jury rejected Pierce's claim of racial discrimination, and the court accepted this conclusion. *See* id.

On appeal, we held that the evidence was sufficient to support the jury's finding of age discrimination, although we reversed the finding of willfulness. Id. at 572–74. We also held, however, that, as a matter of contract law, the release unambiguously covered Pierce's claims. Id. at 568. Rejecting Pierce's state-law defenses to the release, we concluded that the release was not the product of duress and that Santa Fe should not be estopped from asserting its validity. Id. at 568–70. We nevertheless decided to remand the case for a determination of whether Pierce's consent to the release was knowing and voluntary and thus sufficient to waive his federal statutory rights. As noted above, we held that the question whether a waiver of ADEA rights was knowing and voluntary should be answered by looking to the totality of the circumstances. Because we were "explicitly adopting this approach for the first time," we believed that "the trial judge, and possibly a new jury," should have an opportunity to apply the totality-of-the-circumstances test we had just adopted. Id. at 572. A second jury has now done so, and Santa Fe appeals the result.

On this second appeal, the railroad takes issue with the district court's entire approach to the proceedings below. More specifically, Santa Fe argues, first, that the district court erred by placing upon the company the burden of proving that Pierce's consent to the release was knowing and voluntary. Santa Fe also objects to several of the court's evidentiary rulings, many of which, in the company's view, improperly permitted Pierce to relitigate his discrimination claims and to argue, in disregard of our holding that the release was clear and unambiguous, that he did not understand the terms of the release.

---

2. In the version of the release quoted in our original opinion, there appears a final sentence, which recites, "I have received over $36,000.00 in exchange for signing this release." *See* 65 F.3d at 567. The actual release signed by Pierce contains no such language. This court incorporated the nonexistent sentence into its opinion in reliance upon representations first made by counsel for Santa Fe in the brief filed in support of the railroad's initial appeal. Counsel for Santa Fe has reiterated this initial misquotation in briefs filed in support of this second appeal, on one occasion italicizing the sentence for emphasis. We have provided counsel an opportunity to explain the discrepancy. Though we accept the explanation proffered for this error, the response to our inquiry leaves us with a degree of unease, in part due to the release's centrality to both appeals. While it is the responsibility of appellate courts to verify references to the record, it is also a reality that courts, in a variety of circumstances, must be able to rely on the representations of the attorneys who appear before them as officers of the court. Any action, whether inadvertent or not, that reflects poorly on the probity of counsel has the unfortunate consequence of inhibiting the litigation process by fostering an atmosphere of wariness.

Finally, Santa Fe contends that, under the totality-of-the-circumstances test we adopted in our first opinion, the company was entitled to judgment as a matter of law.

## II.

■ We first address Santa Fe's contention that the district court erred in placing upon the railroad the ultimate burden of proving that Pierce's waiver was knowing and voluntary. The debate centers around one sentence in our first opinion—our direction to the district court that "after the employer raises the existence of a release as a defense to a discrimination suit, the burden rests on the plaintiff to challenge specifically his voluntary and knowing consent to the release," 65 F.3d at 572. Santa Fe argues that nothing could be clearer: Pierce bore the burden of *proof* as to whether he executed the release knowingly and voluntarily. Not so, responds Pierce: our instruction is better understood as addressing the burden of *production.*[3]

The parties can find little support for their respective positions in the opinions of our fellow courts of appeals. Although several courts have explored the factors to be considered in determining whether a waiver of an ADEA claim was knowing and voluntary, few have explicitly discussed the proper allocation of the burden of persuasion.[4] This silence may be attributable to the fact that few courts, if any, have had to confront the unusual posture in which Pierce's claim stood on remand. Pierce already had proved his discrimination claim; the sole issue in the second trial was whether his release was knowing and voluntary under the totality-of-the-circumstances test set forth in our first opinion.

Consequently, the answer to the question posed by Santa Fe's second appeal is not immediately obvious. Our resolution of the matter, however, will not have long-ranging consequences, for Congress has provided its own answer. Under the 1990 amendments to the ADEA enacted in the Older Workers Benefit Protection Act ("OWBPA"), Pub.L. No. 101–433, § 201, "the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary" based on certain statutory criteria. *See* 29 U.S.C. § 626(f)(3).[5] Congress was equally

**3.** The district court shared Pierce's reading of our opinion: "The language quoted by the defense from the court of appeals' opinion at 572 could as easily apply to production burdens or, as the court concludes is more likely, to the issue of when there is sufficient evidence of invalidity to justify submission of the issue to the jury."

**4.** Although we might have looked for guidance from cases dealing with contractual waivers of the right to jury trial, neither party can find comfort there. The circuits are split on whether the party asserting the validity of such a waiver bears the burden of proof as to whether the waiver was knowingly and voluntarily executed. *See Hulsey v. West*, 966 F.2d 579, 581 (10th Cir.1992); *compare Leasing Service Corp. v. Crane*, 804 F.2d 828, 833 (4th Cir.1986) ("Where waiver is claimed under a contract executed before litigation is contemplated, we agree with those courts that have held that the party seeking enforcement of the waiver must prove that consent was both voluntary and informed.") (citing *National Equipment Rental Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir.1977)), *with K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 758 (6th Cir.1985) ("We agree that in the context of an express contractual waiver the objecting party should have the burden of demonstrating that its consent to the provisions was not knowing and voluntary."). Similarly unhelpful is a case relied upon by *Santa Fe, Williams v. Phillips Petroleum Co.*, 23 F.3d 930 (5th Cir.), *cert. denied*, 513 U.S. 1019, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994), which dealt with waivers of claims brought under the Worker Adjustment and Retraining Notification Act. It is true that in *Williams* the Fifth Circuit, reviewing a grant of summary judgment based in part on the existence of waivers executed by the plaintiffs, stated that "[o]nce a party establishes that his opponent signed a release that addresses the claims at issue, received adequate consideration, and breached the release, the opponent has the burden of demonstrating that the release was invalid because of fraud, duress, material mistake, or some other defense." 23 F.3d at 935. Following this *dictum*, however, the court went on to declare, in language more appropriate to the summary judgment context, that the plaintiff "carried the burden to demonstrate that there was a genuine issue of material fact on a defense to the validity of the releases. She was obligated to produce *some evidence* of fraud, duress, or other basis for holding the release invalid." 23 F.3d at 936 (emphasis added).

**5.** Under section 201 of the OWBPA, 29 U.S.C. § 626(f), an employee may not waive an ADEA claim unless the waiver is knowing and voluntary. A waiver will not be considered knowing

clear, however, that the waiver provisions of the OWBPA would not apply to waivers executed before the date of its enactment, October 16, 1990. Because Pierce signed his release in November 1989, we cannot look to the OWBPA, but must explain our previous opinion in light of the law as it existed prior to the enactment of that statutory scheme.[6]

A little history puts our prior decision in context and goes a long way toward answering the question posed by Santa Fe's appeal. For a time, it was not certain that unsupervised waivers of ADEA rights (i.e., waivers executed without the participation of the EEOC) should be valid under any circumstances. The ADEA incorporates enforcement and damages provisions of the Fair Labor Standards Act ("FLSA"), see 29 U.S.C. § 626(b), and it was arguable that the ADEA, like the FLSA, should be read to prohibit private waivers of the rights it established. *See Runyan v. National Cash*

*Register Corp.*, 787 F.2d 1039, 1045–46 (6th Cir.1986) (en banc) (Engel, J., dissenting); *see generally Coventry v. United States Steel Corp.*, 856 F.2d 514, 521 n. 8 (3d Cir.1988) (discussing but rejecting view "that the ADEA, like the FLSA, should be read to preclude completely private waivers of rights guaranteed by its antidiscrimination provision"). This reading, however, did not give due regard to the federal policy favoring out-of-court settlements of disputes arising under the ADEA. In light of this policy, the federal courts of appeals held that the validity of waivers of ADEA rights should be judged with reference to the standards applicable to claims brought under other antidiscrimination provisions, such as Title VII. *See Coventry*, 856 F.2d at 521 n. 8; *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 401–02 (2d Cir.1989).[7] Hence our first opinion's application of the "voluntary and knowing" test that the Supreme Court has sanc-

and voluntary "unless at a minimum" the following conditions are met:

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult an attorney prior to executing the agreement;

29 U.S.C. § 626(f)(1). In addition, if the waiver is in settlement of an EEOC charge or a lawsuit filed under the ADEA, the employee must be given "a reasonable period of time within which to consider the settlement agreement." 29 U.S.C. § 626(f)(2). If not in settlement of such a suit, the waiver is valid only if the employee is provided 21 days within which to consider the agreement (45 days "if [the] waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees") and is permitted to revoke the waiver within seven days following its execution. 21 U.S.C. § 626(f)(1)(F), (G).

6. Santa Fe asserts, without citation to any authority, that "to the extent that OWBPA sheds light on this matter, it simply documents that, prior to the Act, the burden was properly placed

on the Plaintiff." Practitioners appear to be of two minds, however, with respect to whether or not the OWBPA merely codified the common-law burden of proof. *Compare* Joel L. Finger, *Selected Topics in Age Discrimination Litigation*, 299 Prac.L.Inst./Lit 9, 12 (1986) ("Under federal common law, the defendant typically bears the burden of proving that the release was knowingly and voluntarily entered into . . . ."), *with* B. Scott Silverman, *Enforceability of Releases and Arbitration Agreements in Individual Employment Discrimination Cases*, C742 A.L.I.–A.B.A. 1091, 1099 (1992) ("The statute reverses the old burden of proof and places upon the employer the burden of proof in litigation to establish that the waiver was voluntary and knowing.").

7. As noted above, Congress, in the OWBPA, ultimately endorsed the judicial consensus regarding the enforceability of unsupervised releases, although in 1989 it considered a proposed statute, The Age Discrimination in Employment Waiver Protection Act of 1989, that contained restrictions on the use of such waivers. *See* Sen.Rep. No. 101–79. The OWBPA rejected these restrictions in response to the EEOC's fear "that it lacked the resources or capability to supervise releases." *See* Sen.Rep. No. 101–263, at 32. The OWBPA's carefully drawn waiver requirements nevertheless reflect the policy concerns underlying the earlier proposal. *See* id. at 15 ("[T]he substitute waiver provisions included as Title II of this bill [the OWBPA] differ from . . . [the Waiver Protection Act]. Nonetheless, the need for such legislation has been fully explained in our earlier report, and—to the extent it is consistent with Title II—we adopt that earlier discussion by reference.").

tioned in the Title VII context. *See* 65 F.3d at 570 (citing *Alexander v. Gardner–Denver*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1022 n. 15, 39 L.Ed.2d 147 (1974) ("In determining the effectiveness of any waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing.")).

At the other extreme from a rule that invalidated all privately executed waivers of ADEA claims is an approach that deems all such waivers effective provided they satisfy the state-made law of contracts. In our first opinion, we noted that some circuits, while acknowledging their responsibility to determine that waivers are knowing and voluntary, nevertheless purport to apply only "general principles of contract construction" in making this determination. *See* 65 F.3d at 570. This approach has the advantage of greater certainty, for a waiver viewed as a contract is more likely to be enforced. Except in the most extreme circumstances, contract law is not terribly concerned with unequal bargaining power, and principles of contract construction, such as the parole evidence rule, tend to limit the inquiry to the four corners of the release. The contract approach, however, does not give sufficient weight to the federal interest in ensuring that the goals of the ADEA are not undermined by private agreements born of circumstances in which employees confront extreme economic pressures or lack information regarding their legal alternatives.

For this reason, we declined in our earlier opinion to limit the inquiry into knowledge and voluntariness to whether the waiver met the requirements of a valid contract. We joined those circuits which look to the "totality of the circumstances" surrounding the execution of a waiver—an approach we deemed "consistent with the strong congressional purpose underlying the ADEA to eradicate discrimination in employment." 65 F.3d at 571. Central to our holding was an awareness that " 'a federal rule rather than absorption of a state rule is appropriate where . . . the rights of the litigants and the operative legal policies derive from a federal source.' " Id. (citing *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981)). Al-

though we recognized "the critical role that the plain language of the contract plays," we also acknowledged that "our inquiry into knowledge and voluntariness cannot end there." Id. Viewed properly, therefore, the totality approach we adopted in our first opinion represents a middle course between a rule of per se invalidity and a contractual approach that would enforce all unambiguous waivers absent fraud or duress.

We have paused to recount this history because the dispute over who should bear the burden of proof on the issue of knowledge and voluntariness implicates some of the same considerations that guided us in adopting the totality approach. On the one hand, it is clear that waivers of ADEA claims are not void as against public policy. It follows that we should be careful not to create a legal environment in which it becomes so difficult for employers to establish the validity of waivers that they cease to have value. With the proper safeguards in place, private settlements are advantageous to employer and employee alike. For both parties, they eliminate the uncertainty and cost of protracted litigation, and, for employees, they promise speedy redress of grievances— a consideration of no small importance in the context of the ADEA. Waivers will no longer be valuable, however, if employees, by repudiating them, can deny employers the benefit of freedom from litigation for which they have bargained. To place upon the employer the burden of demonstrating that an otherwise unambiguous release of claims was not signed knowingly and voluntarily risks undermining the usefulness of waivers by clouding them in uncertainty. This danger is compounded by the difficulty of demonstrating that someone's actions were knowing and voluntary, an assumption about human behavior which the law typically indulges as a matter of faith.

This line of reasoning has force. Though it gives us pause, we believe that the concerns it reflects are adequately addressed by placing the burden of production, rather than the burden of proof, on the party who, like Pierce, seeks to invalidate a waiver of federal rights. As we noted in our first opinion, such a rule does not mean that a claim that a

438

release was not executed knowingly and voluntarily will necessarily reach a jury. The plaintiff must come forward with specific evidence sufficient to raise a question as to the validity of the release under the totality approach we articulated in our first opinion. "A bald assertion of misrepresentation by the employer, standing alone, is legally insufficient." 65 F.3d at 572. Moreover, certain factors, such as the participation of an attorney in negotiating the release, will give rise to a presumption that the waiver was knowing and voluntary. Id. at 571 n. 1. As for the difficulty of establishing that an employee did not act knowingly and voluntarily, a burden which some have likened to "proving a negative," we believe that this difficulty is minimized by requiring the employee to produce specific evidence of factors that vitiated his consent to the release.

This conclusion is consistent with the language of our original opinion, which instructed that "after the employer raises the existence of a release as a defense to a discrimination suit, the burden rests on the plaintiff to challenge specifically his voluntary and knowing consent to the release." Id. at 572. The term "challenge" suggests only an initial attack, an invitation to defend, but not ultimate victory. More equivalent to a burden of proof or persuasion is a requirement that a party "demonstrate" or "establish" a proposition. In our previous opinion, moreover, both the majority and the dissent noted without disapproval that, during the first trial, the district court placed upon Santa Fe the burden of demonstrating that Pierce knowingly and voluntarily executed the release.

We observe, finally, that placing the burden of proof upon Santa Fe with respect to whether Pierce knowingly and voluntarily waived his ADEA claims is consistent with our holding that waivers of federal rights cannot be governed solely by principles of

contract—a holding that stems from the view that "[w]aivers of federal remedial rights ... are not lightly to be inferred," *Torrez v. Public Service Co. of New Mexico,* 908 F.2d 687, 689 (10th Cir.1990); *see also Bormann,* 875 F.2d at 403 ("We stress again the need to examine carefully any situation in which an older worker bargains away the statutory right to be free from age discrimination."). In *Alexander v. Gardner–Denver,* the Supreme Court explained that "in determining the effectiveness of any waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing." 415 U.S. at 52 n. 15, 94 S.Ct. at 1022 n. 15 (emphasis added). Knowing and voluntary consent is therefore a prerequisite to the effectiveness of waivers of federal antidiscrimination claims.[8] Accordingly, the party seeking to enforce a waiver of ADEA rights should bear the burden of proving knowing and voluntary consent.

## III.

Santa Fe also maintains that the district court erred in denying its motion for judgment as a matter of law following the jury's verdict. Our review of the district court's ruling on Santa Fe's motion is *de novo,* but limited to a very narrow scope. *See Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 629–30 (7th Cir.1996). We view the evidence in the light most favorable to the non-moving party (Pierce), and ask only "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict." Id. at 629. We will reverse only if no rational jury could have found for Pierce. Id. at 630. Under this standard of review, we do not believe that Santa Fe was entitled to judgment as a matter of law.

8. Of course, it could be objected that, although absence of fraud is, in a sense, a prerequisite to the validity of any contract, fraud is nevertheless an affirmative defense which the party seeking to avoid a contract must establish. This objection, however, carries force only if one conceives of the employer's waiver defense purely as an attempt to enforce a contract. Our adoption of the totality-of-the-circumstances test stemmed from a recognition that the inquiry into knowledge and voluntariness "cannot end" with the plain language of the contract. *See* 65 F.3d at 571; *see also Coventry,* 856 F.2d at 522 ("[T]he inquiry into the validity of a release of discrimination claims does not end with the evaluation that would be applied to determine the validity of a contract.").

In fact, there was a good deal of evidence from which the jury could have inferred, based on the factors we discussed in our first opinion, that Pierce's consent to the release was not knowing and voluntary under the totality of the circumstances. In particular, at least three areas of factual dispute permitted the inference drawn by the jury. These disputed areas concern the representations made to Pierce regarding the effect of the release, the time he was given to consider the release, and the consideration Pierce received for the release.

Pierce approached Pacocha about obtaining a 360 severance package after he learned that other employees had received the package. Pacocha and Leighton Broxterman, the employee who authorized the deal, both testified that when they decided to offer Pierce the package they did not know that he had filed age and race discrimination claims with the EEOC. When Pierce initially asked Pacocha whether the release would cover discrimination claims, Pacocha's response, according to the testimony of both Pierce and Pacocha, was that Pacocha did not believe so but would check. Beyond this point of agreement, the stories diverge: Pierce testified that Pacocha subsequently confirmed that the release would not bar Pierce's discrimination claims, while Pacocha and a Santa Fe employee who witnessed the second meeting testified that Pacocha told Pierce just the opposite.

The jury was entitled to credit Pierce's testimony over Pacocha's. After deciding to credit Pierce's version of events, it would have been difficult for the jury to conclude that the waiver was knowing and voluntary. See K.M.C. Co., 757 F.2d at 757 ("[W]hether the appropriate standard is that K.M.C.'s waiver must have been knowing and voluntar[y], or merely 'clear,' . . . we conclude that

if in fact it was represented . . . that the jury waiver provision would not be enforced under circumstances such as those in the instant case, neither standard is met."). Santa Fe is well aware of the damage done by this testimony, for it argues strenuously that testimony regarding Pacocha's representations should not have been admitted. For reasons elaborated below, however, we disagree. Moreover, despite our holding that as a contractual matter the release unambiguously covered Pierce's claims, the jury was entitled to take note of the absence of specific language that might have mitigated the effect of any misrepresentation on Pacocha's part. See Torrez, 908 F.2d at 690 ("The language of the release, although clear and unambiguous, failed to mention specifically waiver of employment discrimination claims."); cf. O'Shea v. Commercial Credit Corp., 930 F.2d 358, 360 (4th Cir.1991) ("In return for these benefits, O'Shea agreed to: 'release Commercial Credit . . . from any and all claims relating in any way to the terms, conditions, and circumstances of [her] employment, whether based on statutory or common law claims, for employment discrimination (including claims of age discrimination), breach of contract . . . or [any] other theory. . . .' "); Bormann, 875 F.2d at 403 ("[T]he district court found that it was undisputed . . . that 'the release itself is written in clear and unambiguous language,' specifically referring to age discrimination claims. . . ."); Cirillo v. Arco Chemical Co., 862 F.2d 448, 450 (3d Cir.1988) ("[The release] 'includes but is not limited to claims arising under federal, state or local laws prohibiting employment discrimination . . . .' "); id. at 451 ("[R]elevant factors in reviewing the totality of the circumstances include, but are not limited to, . . . the clarity and specificity of the release language . . . .") (emphasis added).[9]

---

9. Santa Fe also points to language in our original opinion stating that "Pierce should have understood the meaning of the agreement," and that "Pierce's reliance was unreasonable as a matter of law." 65 F.3d at 570. Those conclusions, however, were the result of our analysis of Pierce's state-law estoppel defense to the release. As we noted, one element of estoppel is reasonable reliance. Obviously, the inquiry into whether Pierce's consent to the release was knowing and voluntary under the totality of the circumstances cannot end with an assessment of the objective reasonableness of Pierce's reliance on Pacocha's representations, for that assessment turns on a determination of what Pierce *should* have known. Of course, the jury was entitled to consider the reasonableness of any putative reliance on representations that contradicted the contract. For example, if the release specifically recited that it barred discrimination claims, it would be less plausible for Pierce to suggest that he relied on Pacocha's assurances to the contrary.

Nor does the temporal element aid Santa Fe. Pacocha testified that on either Monday, November 20 or Tuesday, November 21 Broxterman approved Pierce's severance package on the condition that the deal be concluded by the end of the shortened week. (Thanksgiving was Thursday, November 23.) According to Pacocha, he met with Pierce on Wednesday and, despite the time constraint imposed by Broxterman, allowed Pierce the Thanksgiving weekend to consider the release, which Pierce signed the following Monday. Pierce, on the other hand, testified that he first met with Pacocha on Tuesday, November 21 and was given only until Wednesday to make his decision. Under either scenario, therefore, Pierce had only one business day within which to weigh his options. Cf. Cirillo, 862 F.2d at 453 ("The terminated employees . . . were told that they could not sign the Release for at least five days and the record discloses that Cirillo took considerably longer to reflect upon the matter."). Santa Fe argues that Pierce had plenty of time to reflect upon his decision over the holiday weekend, and points out that Pierce did in fact consult with his case investigator at the EEOC.[10] Nevertheless, Santa Fe's own version of events—that on Monday Broxterman wanted the deal closed by Wednesday, and that Pacocha ultimately gave Pierce from Wednesday until the Monday after Thanksgiving to consider the release— not only suggests inordinate time pressure but also belies the company's claim that it encouraged Pierce to consult with counsel.

Finally, there is the matter of consideration. After learning that his department would be moving from Illinois, Pierce sought and obtained the severance package in connection with which he received $36,000 and signed the release that is the subject of this appeal. Although Santa Fe insists that Pierce "was not at all entitled to this amount by law or even by past practice," the testimony of Pacocha and Broxterman suggests that this representation does not paint a complete picture. Under the collective bargaining agreement in place at the time, an employee who did not wish to relocate to a new worksite had the right to "bump" a less senior employee, that is, to take his or her job. This process might continue until an employee at the bottom of the pecking order was without a position, in which case the unlucky employee would be furloughed. Santa Fe, however, remained obligated to pay wages and benefits to protected union employees on furlough until the company could find them new employment.[11] The package that Pierce received was generally offered to employees in exchange for an end to their right to continue receiving payments and benefits from Santa Fe; approximately 20 employees had accepted the package during the summer of 1989. Thus, although Santa Fe voluntarily offered such packages, the packages served to extinguish obligations arising under the union contract. Pacocha and Broxterman pointed to these considerations in explaining the decision to offer a severance package to Pierce. As Broxterman testified, "It meant that we could either reduce a position or return somebody from a furlough status."[12]

10. On direct examination, Pierce's response to the question "what conclusion did you draw [after talking to the EEOC investigator]?" suggested that the investigator indicated to Pierce that the release would not bar his claims. This circuitous mode of questioning was necessitated by the mistaken belief that the EEOC investigator's response was hearsay. Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Because the correctness of the investigator's response mattered not a whit, but was introduced only to establish Pierce's state of mind, the response was not hearsay.

11. Broxterman testified that protected union employees on furlough were entitled to payments and benefits until the age of 70.

12. Pacocha explained, "I pointed out to Mr. Broxterman that Gene [Pierce] had approached me and asked for a severance, that we had a number of people that we would wind up giving a severance to because of the particular geographic location they were in. And since Gene had asked and he obviously wanted to leave the company, other people may not want to leave the company but be forced into it, I thought it would be a good thing to do to make Gene happy and to make somebody else happy by giving Gene a severance." In response to the follow-up question, "So if it wasn't given to him and he bumped, somebody else would be bumped and you would end up giving the severance to them?" Pacocha testified, "Right. We were giving one to somebody, and Gene had asked for it or had asked me to look into it, and so I mentioned to Leighton that this looked like something that was

Moreover, both men were unequivocal in stating that Pierce's EEOC complaint had no influence on either Santa Fe's decision to offer Pierce the package or the amount he received. On the basis of this testimony the jury could well have concluded that Pierce received the severance package in consideration of his right, upon the relocation of his department, to bump an employee with less seniority than he, which might ultimately force Santa Fe to furlough another employee, who would continue to receive · wages and benefits. Although Santa Fe may not have been obligated to offer Pierce the package, the fact that it was a standard buy-out offered to several other employees, and that the existence of Pierce's EEOC claim had no effect on the package, suggests that Pierce may not have been aware that he was bargaining away his statutory rights.

■ Santa Fe points out that the severance package was conditioned on Pierce's signing the release. Indeed, Broxterman testified that every employee receiving a severance package was required to execute a release. But a company's conditioning of all severance packages upon the signing of a general release of any and all claims cannot defeat the inquiry in a particular case into whether the waiver of statutory rights was knowing and voluntary. It must be remembered that our inquiry is not whether there was consideration adequate to support the release; if there were none, the release would fail as a matter of contract, and the knowing-and-voluntary test would be unnecessary. Rather, the question is whether Pierce's waiver of his rights was knowing and voluntary under the totality of the circumstances. In that regard, the existence of a future obligation that was extinguished in exchange for the extension of a standard severance package stands as merely one piece of objective evidence tending to support Pierce's claim that he was subjectively unaware that he was waiving important statutory rights.[13] It may have been the case—

indeed it appears certain—that Santa Fe would not have granted Pierce the severance package without his signing the release. Yet under the circumstances described by Broxterman and Pacocha, it would have been possible for Pierce to conclude that the release did not constitute a central component in the bargain. If, for example, the waiver had entitled Pierce to the more generous of two severance packages, it would be less plausible for him to argue that he did not appreciate the gravity of the document he executed. *Cf. Gormin v. Brown–Forman Corp.*, 963 F.2d 323, 324 (11th Cir.1992) (*"Brown–Forman* gave the terminated. employees the option of accepting an extra benefits package in consideration for a complete release of any claims the employee might have against the company."); *Bormann,* 875 F.2d at 400–01 (describing choice between two termination packages, more generous of which was conditioned on employee's signing release); *Cirillo,* 862 F.2d at 449–50 (same). In short, the relevant question is not whether Santa Fe regarded the release as essential, but whether Pierce was aware of the rights he would forfeit by signing the release. Based on the evidence, the jury could reasonably conclude that Pierce did not possess this understanding.

We have stressed the above factors, not because any one of them is dispositive, but because the jury was entitled to consider them. Had the jury found in favor of Santa Fe, we would be able to point to factors supporting that verdict. Had the members of this panel sat as jurors, we might have interpreted the facts differently. Our role, however, is not to reweigh the evidence, but only to ensure that the jury rationally considered the evidence. We are satisfied Santa Fe was not entitled to judgment as a matter of law.

## IV.

■ Santa Fe also complains of certain evidentiary rulings by the trial court, fore-

---

good for everybody." Contrary to Santa Fe's assertion, therefore, the inference that the company "offered the package to Pierce in order to extinguish its liabilities under the union contract" is not "purely speculative."

13. It is significant, therefore, that Pierce apparently was not told, in connection with the severance offer, that an exception to general practices was being made on his behalf.

most among these being the admission of testimony that bore on Pierce's understanding of the release. Our prior holding that the release "plainly covers Pierce's claims," 65 F.3d at 568, and that it contains no extrinsic ambiguity, Santa Fe reasons, foreclosed at the second trial the argument that Pierce believed the release covered only claims arising out of his union position, as opposed to the nonunion analyst position that was the subject of his discrimination claim. Pointing to our observation that evidence of what Pacocha told Pierce "is exactly the type of subjective testimony we do not allow," id., Santa Fe faults the district court for permitting the introduction of testimony regarding Pacocha's representations to Pierce.

Santa Fe misapprehends the nature of the totality-of-the-circumstances test. The inquiry into whether a waiver of ADEA rights was knowing and voluntary is, at bottom, an inquiry into the mental state of the party who is purported to have waived those rights. This is the rationale behind our rejection of pure contract analysis in favor of the totality approach. In order to protect truly voluntary bargains, we do not permit claims of subjective misunderstanding, standing alone, to defeat an otherwise valid release; but the totality approach permits the introduction of evidence, beyond that which could be considered for the purposes of interpreting a contract, from which the jury may infer that the releasor did not, in fact, understand the legal consequences of his actions. This court's rejection of Pierce's contract-law defenses is therefore beside the point. See 65 F.3d at 571 ("While we recognize the critical role that the plain language of the contract plays, our inquiry into knowledge and voluntariness cannot end there."); *Torrez*, 908 F.2d at 690 ("[U]nambiguous language cannot derail our analysis of whether the waiver was made knowingly and voluntarily."); *Coventry*, 856 F.2d at 524 ("not enough" under totality approach to determine that release "was written in clear,

specific language and that [plaintiff] was competent enough to read and understand its literal meaning").[14] For example, our observation that evidence of Pacocha's representation "is exactly the type of subjective testimony we do not allow," was entirely correct insofar as it applied to the issue of whether the release contained an extrinsic ambiguity. Questions of contractual ambiguity turn on whether there is more than one reasonable interpretation of a contact. In that regard, Pierce's understanding of the release could not, in the absence of some interpretive dilemma, provide the basis for a finding of extrinsic ambiguity. Pacocha's representations, however, are entirely relevant once the inquiry turns to whether Pierce understood the full implications of the release. *See, e.g., Bormann*, 875 F.2d at 403 ("We also agree that the only genuine factual issue was whether the company misrepresented the effect of the release."); *see also K.M.C. Co.*, 757 F.2d at 757 ("[T]he explanation of the [jury waiver] clause allegedly given by [the defendant]'s representative to Butler of *K.M.C.* is no less an objective circumstance than whether or not the parties bargained over a particular provision."). The district court's evidentiary rulings flowed from a proper appreciation of the totality approach.

■ Santa Fe also contends that the district court abused its discretion in admitting evidence of Pierce's underlying discrimination claims and of the humiliation he felt at having been demoted to file clerk. The sole issue upon remand, the railroad argues, was the execution of the release; the introduction of events relating to Pierce's age and race discrimination claims, many of which occurred months earlier, served only to prejudice the jury against Santa Fe. We agree that, when the validity of a release is the only question before a jury, trial courts should be exceedingly careful to ensure that underlying claims of discrimination do not cloud the issue. On the facts of this case, however, we

---

14. The district court thus properly rejected Santa Fe's request for the following jury instruction: "I further instruct you that the language of the release is, as a matter of law, clear and unambiguous and covers the claims Plaintiff seeks to assert. You should disregard any contention or argument that Plaintiff did not understand this fact or that the release is capable of some other interpretation." Our remand would appear whimsical indeed if it prescribed such a meaningless exercise.

do not believe that the court's admission of some evidence related to Pierce's underlying claims warrants reversal.

The district court exercised a significant screening function with respect to evidence from the first trial. The court held that the jury would not be informed of its predecessor's finding in favor of Pierce and instructed the jury on at least two occasions that it was not to consider the merits of Pierce's discrimination claims. Moreover, the district court did not indiscriminately admit evidence of Santa Fe's discriminatory conduct. Rather, the guiding principle behind the court's evidentiary rulings was that Pierce's "perception of whether he had a valid claim has some relevance to the issue of whether he knowingly and voluntarily released that claim." The court was careful to limit the evidence to matters of direct knowledge to either Pierce or Pacocha. Thus, for example, the court largely denied Pierce's request to admit the prior testimony of Steven Mitchell, a Santa Fe official who had been impeached at the first trial in his efforts to bolster Santa Fe's claim that Pierce had been fired as a result of a carefully considered reduction in force. The court limited the Mitchell testimony to portions dealing with two occasions on which Pierce had raised the issue of Santa Fe's treatment of its African–American employees. "[T]he rationale on which I believe that [the Mitchell testimony] is admissible," the court explained, "is that it demonstrates the consistency with which Mr. Pierce asserted his rights and suggests some support for his testimony that he would not have knowingly relinquished his discrimination claims." Also admissible under the district court's approach to the second trial was the list of employees on which Pacocha had written the word "risk" next to Pierce's name. This evidence, after all, tended to undermine Pacocha's assertion that, when he first presented the release to Pierce, he had not apprised himself of the release's effect should Pierce file a discrimination suit against Santa Fe.

The district court's evidentiary rulings reflect a sensible accommodation. The merits of an underlying discrimination claim arguably have little relevance with respect to whether a party's waiver of that claim was knowing and voluntary. Undeniably relevant to the question of knowing and voluntary waiver, however, is whether the employee has asserted a grievance prior to the execution of a release, and the force with which he has asserted that grievance. When the evidence demonstrates that the waiver of statutory rights was *the* basis of the bargain between employee and employer, it is logical to infer that the attention of both parties, at the time of negotiations, focused squarely upon the waiver and its implications. For this reason, not all of the evidence of which Santa Fe complains was necessarily unfavorable to the railroad. It was open for the company to argue that Pierce, believing he had a valid discrimination claim against Santa Fe and having demonstrated in the past a willingness to speak out on behalf of minority employees, was unlikely to sign away his rights without fully informing himself of the consequences. Although the jury did not draw this inference, the district court's evidentiary rulings nonetheless afforded the jury the context necessary to evaluate the circumstances surrounding Pierce's consent to the release.

■ Santa Fe next objects to the district court's ruling admitting evidence that the company did not bring Pierce's release to the attention of the EEOC. The argument is that, because Santa Fe was not obligated to raise the release before the EEOC, its failure to do so had no probative value, and evidence on this score could only have prejudiced or confused the jury; such evidence therefore should have been excluded under Rule 403 of the Federal Rules of Evidence. The district court apparently accepted Pierce's theory that Santa Fe's failure to raise the release tended to show that the release was a belatedly contrived defense. Though this line of attack may be at odds with Pierce's suggestion that Pacocha deliberately "schnookered [Pierce] into signing the release," there is no requirement that a party adopt a consistent position throughout trial, and it was for Santa Fe to exploit the inconsistency. We do not believe that admission of this evidence constituted an abuse of discretion.

■ Turning from evidence that *was* admitted at the second trial, we address, as a

final matter, a piece of evidence that was *not* admitted. Santa Fe argues that the district court abused its discretion when, reversing a ruling from the first trial, it held that a memorandum prepared by Pacocha summarizing his meetings with Pierce was inadmissible hearsay. The memorandum was marked "to file" and was placed both in Pierce's personnel file and in a file in which Pacocha kept copies of releases signed by employees. On voir dire examination, Pacocha testified that he maintained personnel files in the ordinary course of business and that he drafted memoranda in order to record "unique" dealings with employees, but that it was not unusual for him to draft such memoranda. He also acknowledged that, although he had been involved in the execution of "six or eight" releases, he had never before drafted a similar memorandum in connection with the signing of a release. The memorandum, Santa Fe insists, was admissible under the business records exception to the hearsay rule. *See* Fed.R.Evid. 803(6).[15]

The district court did not abuse its discretion in excluding this evidence. Although Santa Fe may have been surprised by the district court's change of heart on this issue, the company does not point to any rule of law that would have bound the court to its earlier ruling. Absent such an obligation, we see no abuse of discretion on the part of the district court, which fully explained the reasons behind its change in position. The court noted that, on the authority of *Wheeler v. Sims*, 951 F.2d 796 (7th Cir.1992), it previously had admitted the memorandum despite "real reservations," but that, upon reviewing more recent cases distinguishing *Wheeler*, the court felt inclined to follow a more conservative approach. It certainly lay within the court's discretion to adopt this stance. Evidentiary rulings are inherently fact-based, and *Wheeler* did not compel one result or the other in this case. As the district court

correctly noted, "the Seventh Circuit [in *Wheeler*] was saying it wasn't error to admit the document, not that it was invariably correct to admit the document." Pacocha's memorandum, in the district court's view, "was not created with the kind of regularity or routine which gives business records their inherent reliability. It was obviously to memorialize an unusual incident ... that Mr. Pacocha may have been concerned could have some litigation potential to it." Thus, the court's ruling was sensitive to the concerns embodied in Rule 803(6). Its application of that rule to the facts of this case was not without basis in the record, and we will not second-guess its determination.

### V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

15. Under Rule 803, the following is "not excluded by the hearsay rule, even though the declarant is available as a witness:"

(6) Records of regularly conducted activity. A memorandum ... in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business

activity, and if it was the regular practice of that business activity to make the memorandum ..., all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness....

Fed.R.Evid. 803(6).