Ralph E. CORNELL, Plaintiff,

v.

DELCO ELECTRONICS
CORPORATION,
Defendant.

No. IP 98–C–0854–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 3, 2000.

Gregory Bekes, Grotke and Bekes, Greenwood, IN, Philip C Eckert, Eckert Eckert & Craven, Indianapolis, IN, for plaintiff.

Mark W Ford, Johnson Smith Pence Densborn Wright & Heath, Indianapolis, IN, for defendant.

### ENTRY GRANTING DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

BARKER, Chief Judge.

Plaintiff, Ralph Cornell (Cornell) sued his employer, Delco Electronics Corpora-

tion, now known as Delphi Electronics Systems Corporation (Delphi), alleging disability and age discrimination and retaliation for Cornell's filing of administrative complaints based on the alleged discrimination. At a settlement conference before Magistrate Judge V. Sue Shields on March 18, 1999, the parties purportedly reached a settlement agreement, memorialized on a sheet of legal paper by Judge Shields and signed by the parties and counsel. Subsequently, Delphi composed a formal, typewritten document incorporating the agreed-upon terms and delivered it to plaintiff's counsel, Mr. Kenneth Lauter (Lauter), so that he could review and approve the agreement and allow Cornell to review and sign it.[1] Lauter approved the document, but Cornell refused to sign it. Because they disagreed about whether an agreement had been reached, Lauter eventually withdrew as Cornell's counsel, and Cornell obtained new representation.

When Delphi moved to enforce the settlement agreement, Cornell responded that due to the length of the conference, by the time it concluded he was unable to understand and/or knowingly consent to the settlement on March 18 because of his disability, namely attention deficit disorder (ADD), and that his waiver of certain elements of his lawsuit was therefore not voluntary and knowing. On November 12, 1999, we conducted an evidentiary hearing on Delphi's motion, at which Magistrate Judge Shields, Mr. Lauter (Cornell's former counsel), Mr. Cornell, and Mr. Raleigh Grady, Delphi's human resource administrator, all testified.

Magistrate Judge Shields testified as to the procedures followed at the March 18, 1999 settlement conference. The parties had met together briefly, then separated to consult with their attorneys with Judge Shields acting as a go-between during negotiations. Judge Shields' view was that everyone had worked hard to find creative solutions to accommodate Cornell and to secure a result that would satisfy his interests. She described Cornell's level of participation at the conference as "very high." When the parties appeared to have reached agreement on a solution, they reconvened, and Judge Shields handwrote the terms on a sheet of legal paper.[2] The parties negotiated a few changes to the document and signed it in Judge Shields' presence to indicate their acceptance of the terms and the accuracy of the memo.

The settlement memorandum's first point reflected the amount of cash Delphi agreed to pay to Cornell, which, Judge Shields explained, included Cornell's attorney's fees. Point two documented Delphi's promise to publish a maximum of twelve articles, related to themes of wellness and disabilities (in particular ADD, we assume), in a company publication for employees. Cornell would be allowed input into the article on disabilities and into choosing future topics, to satisfy his concerns about insensitivity to disabilities in the workplace. The third item recorded in the Shields memo indicated that Delphi would make available to Cornell assistance to help improve his technical writing and communication skills, as well as other functions affected by his disability, for a maximum of eight hours per week for twelve weeks. Fourth, the parties agreed to keep the amount of the settlement payment confidential. Fifth, Cornell agreed to dismiss with prejudice all claims he had accrued up to that time against Delphi, with the exception of potential claims arising from patent authorship. Cornell and his attorney specified that they were conditioning their acceptance of the agreement upon Delphi's approval of this last point—neither Grady, acting as the representative of Delphi, nor counsel for Delphi had authori-

---

1. This document was admitted at the hearing as Defense Exhibit B. In moving to enforce the settlement agreement, Delphi wishes to enforce the agreement purportedly reached by the parties at the settlement conference on March 18, 1999. To the extent that Exhibit B does not accurately reflect the agreed-upon terms, Delphi does not seek its enforcement.

2. Judge Shields retained the original in her files and brought it to the hearing, where it was admitted as Defense Exhibit A.

ty to except patent issues unrelated to the present suit. Finally, in the event that Cornell experienced future difficulties at work, he promised to first raise the issues with Grady or whomever was serving as Delphi's affirmative action coordinator. This provision was intended to accommodate Cornell's difficulty in communicating by ensuring access to a sympathetic and responsible Delphi liaison to prevent any future issues from becoming severe problems.

Judge Shields testified that she had no reason to believe Cornell did not understand the terms of the settlement and that she would not have allowed Cornell to sign the agreement if she had any doubts about his competence or understanding. In her extensive experience, conducting hundreds of settlement conferences, Judge Shields has had other occasions when she recessed the conference because she felt one of the parties was not capable of proceeding; but, she testified she did not feel this conference should be halted and that neither Cornell nor his attorney at any point had asked that the conference be adjourned for the day. Cornell seemed focused at the March 18 meeting and, though fidgety, was not uncontrollably or excessively so; furthermore, Judge Shields recalled no time when Cornell expressed or otherwise indicated that he did not understand what was happening.

After the March 18 conference, in contacts initiated by Cornell, he and Judge Shields talked several times by telephone and in person about Cornell's fears for his job security, and Judge Shields encouraged Cornell to try to smooth things out with his employer. Judge Shields did not recall Cornell ever saying during these conversations that he had not understood what had occurred at the settlement conference or that he thought no settlement had been achieved.

The next witness, Mr. Lauter, counsel for Cornell at the time of the settlement conference, offered a description of the terms of the settlement agreement that mirrored Judge Shields', summarized above. Though he no longer represents Cornell, Lauter's firm is entitled to receive one-third of the cash settlement amount if the agreement is enforced. Lauter characterized Cornell's level of participation at the March 18 conference as "very high"; for example, it was Cornell who initiated the proposed patent-related revisions that were eventually made to Judge Shields' draft of the settlement agreement. Cornell "participated in asserting what he would or would not agree to, and what needed to be or not be in the agreement in order for that to be agreed to." (Tr. at 26). Lauter never believed then or now that Cornell did not understand or was unable to participate in the conference. In Lauter's practice as an attorney he has suspended depositions in the past when he felt his client was not able to continue, but he "never even considered" doing so on this occasion. Lauter testified that in his opinion the parties reached a settlement agreement that day, that all of Cornell's concerns about the agreement had been resolved, and that Cornell himself read the agreement before Cornell signed it.

Next, Mr. Grady, who represented Delphi at the March 18 conference, testified that Cornell participated "a lot" in the conference. Grady has never believed that Cornell did not understand what was happening that day. As for the terms of the agreement purportedly reached by the parties, Grady agreed with the explanation provided by Judge Shields and Mr. Lauter. In addition, Cornell had e-mailed Grady the day after the conference and stated that he (Cornell) agreed to the settlement in good faith, but against his better judgment.[3]

From the testimony at the hearing, we determined that Cornell is 54 years old, completed high school, earned a degree in electronic engineering technology in two years of vocational training at ITT Technical Institute, and later earned a degree in business through a program at Indiana

---

**3.** A printed-out copy of the e-mail was admit-        ted as Defense Exhibit C.

Wesleyan in which life experiences fulfill some of the academic prerequisites. After he completed his vocational training, Delco (now Delphi) hired Cornell in its advanced development area. Cornell works at least 40 hours per week at the Delphi plant in Kokomo, where his duties involve the design, processing, and development of "flip chip" technology. He lives alone in his house in Kokomo; his three children are grown and also live in the area. Cornell drives a car and carries on all of the functions, such as grocery shopping, required to care for himself. In his free time he volunteers by working with children who have disabilities similar to his own.

Cornell informed us that in 1996, Dr. George Lewis diagnosed him as having attention deficit disorder (ADD), as well as dyslexia, depression, and obsessive-compulsive disorder (OCD). He had been receiving medical treatment for symptoms of these maladies since late 1993, and has taken various prescription medications, including Ritalin, Dexedrine, and Prozac, to help control the manifestations of his illness. At the hearing, Cornell stated that when he does not take his medicine, he has difficulty focusing and "shuts down."

Cornell testified that on March 18, 1999, the day of the settlement conference, he was not able to take his afternoon dose of medications, Dexedrine and Prozac. Because the first settlement conference before Judge Shields had lasted only an hour or an hour and a half, Cornell did not anticipate that the second conference, scheduled for noon on March 18th, would last any longer; therefore, he did not bring his afternoon dosage of medication with him to the courthouse. He had taken his medication at 9:00 that morning, arrived at Lauter's office around 11 or 11:30, and traveled to the courthouse to Judge Shields' office. The judge was delayed, so the conference started and ended late; Cornell did not leave the courthouse before 8:00 p.m.

Without his medication, Cornell reported, he had difficulty focusing: "The harder I try, the more I shut down ... And the longer the day went on, it became more and more difficult for me to get the point across what I wanted to get across and get done what I wanted to get done. It was not happening." (Tr. at 64). He was having a "flight/fight symptom," and finding it "difficult ... to bring everything into perspective." Cornell said that "later on," he was not able to reason and make an informed decision; he just wanted to leave. Cornell also explained that the next day, when he wrote in the e-mail to Grady that the original agreement was against my "better judgment," he meant that he "felt like [he] really shouldn't have signed it; but under the conditions that [he] was in at the time, that's what happened." (Tr. at 69–70).

Cornell testified that he believed that the document he signed on March 18 was a "first draft," and that he would have an opportunity to review the final draft, in which "certain protections" and "concerns," discussed at the conference but not "totally" included in the memorandum created by Judge Shields, would be elaborated. However, when Cornell saw the typewritten version (Exhibit B), he felt unsure that it protected his interests: it seemed "skewed" from what he remembered the original agreement to be, had "many addendums to what originally was stated," and did not adequately address all the concerns he had raised at the conference. Cornell asked Lauter, and then Judge Shields, to furnish him with a copy of the original (handwritten) agreement (Exhibit A), because Exhibit B was "not what [he] agreed to."

Although Cornell admitted at the hearing that he understood each element of the settlement to be what was outlined in Exhibit A and explained by Judge Shields, he added that he did not believe the handwritten document was the final agreement to which he had assented, and that it differed in some respects from what he understood the agreement to be. Cornell had enumerated particular objectives at the begin-

ning of the conference, for example, ensuring that Delphi hired an appropriately skilled person to assist him with communication; but, as he "faded away," those requests were buried in the discussion and were not reflected in Exhibit A. Lauter was present throughout the entire settlement conference, presumably representing Cornell' interests, and they periodically conferred privately during the negotiations. Still, according to Cornell, Exhibit A did not specify that, as Cornell understood it, he would be evaluated after the twelve week accommodation period to see what additional arrangements would be necessary. The purported agreement also did not address Cornell's desire for job security. Finally, Cornell said the division of the cash sum to allow for attorneys fees was not "broken down," and that he did not understand how the money would be divided between himself and his counsel.

On cross examination, Cornell admitted that he had signed the document written out by Judge Shields, and that Exhibit A was the only document he had signed regarding this case. Cornell admitted that he did not try to stop the conference because he could not understand what was happening—although he believed he told Judge Shields "this is confusing to me."

*Legal Standard*

Seventh Circuit holdings remain unclear as to what law, federal or state, determines whether a valid settlement of a federal claim has been reached. *Compare Taylor v. Gordon Flesch Co.*, 793 F.2d 858 (7th Cir.1986) (federal common law of contract governs) *with Morgan v. South Bend Community Sch. Corp.*, 797 F.2d 471 (7th Cir.1986) (state contract law governs). *See also Fleming v. United States Postal Serv. AMF O'Hare*, 27 F.3d 259, 260 (7th Cir.1994) (noting unsettled state of law and citing cases suggesting state contract law should be federal rule of decision unless federal interests disserved.)

■ Normally, a motion to enforce a settlement agreement will be treated as a motion to enforce any other kind of contract. *Carr v. Runyan*, 89 F.3d 327, 331

(7th Cir.1996). Under Indiana law, a binding contract can result (absent fraud or duress) when an offer is accepted and the contracting parties have a meeting of the minds, regardless of whether they sign a written agreement. *See Straub v. B.M.T.*, 645 N.E.2d 597, 598 (Ind.1994); *Pinnacle Computer Servs., Inc. v. Ameritech Publ'g, Inc.*, 642 N.E.2d 1011, 1013 (Ind.Ct.App. 1994); *International Creative Management, Inc. v. D & R Entertainment Co.*, 670 N.E.2d 1305, 1312 (Ind.Ct.App.1996). Under federal contract principles, as under Indiana law, an oral settlement agreement can be enforced unless the parties expressly agree not to be bound until the agreement is reduced to writing. *Taylor*, 793 F.2d at 862. Contracts may be valid even if they specify that a condition must be fulfilled in the future, provided that the condition is indeed fulfilled.

■ A party cannot avoid a contract in Indiana unless he was of unsound mind when he entered the agreement and had no reasonable understanding of the contract's terms due to his instability. *Gallagher v. Central Indiana Bank, N.A.*, 448 N.E.2d 304, 307 (Ind.Ct.App.1983). However, the contract approach does not give sufficient weight to federal interests in ensuring that the goals of anti-discrimination statutes are not undermined by agreements made between parties with unequal bargaining power. *See Pierce v. Atchison Topeka and Santa Fe Ry. Co.*, 110 F.3d 431, 437 (7th Cir.1997) (*Pierce II*). Therefore, when a party to a settlement agreement purports to waive or release federally-based claims, courts will examine the totality of the circumstances in which the parties made the agreement to ensure that any waiver of civil rights was knowing and voluntary. *Id.* at 436–37. This may include, but is not limited to, analysis of the following factors:

(1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the

employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration being given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract law; and (8) whether the employee's release was induced by improper conduct on the defendant's part. *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir.1995) (*Pierce I* ).

■ In addition, the Seventh Circuit has held that when a plaintiff is represented by independent counsel who actively negotiates a release, his waiver is presumed to be knowing and voluntary absent vitiating circumstances such as fraud or duress. *Pierce II*, 110 F.3d at 438; *see also Riley v. American Family Mut. Ins. Co.*, 881 F.2d 368, 373–74 (7th Cir.1989) (adding that malpractice is proper remedy if counsel inaccurately conveys effect of release to plaintiff or fails to draft language adequate to protect plaintiff's rights).

### Discussion

■ We find that the requirements for the formation of a valid contract were satisfied in this case. In addition, considering the totality of the circumstances, we find that Cornell's waiver of his federal claims was knowing and voluntary.[4] The requisite meeting of the minds is evidenced by

Cornell's signing the agreement. There was no evidence that he was compelled to agree, or that he had no other alternative but to agree, as would be required to find duress under Indiana law. Cornell was perfectly free to refuse to settle his claims, but, to use his own words, he agreed "in good faith" though it may have been against his better judgment. He cannot change his mind because he later thought otherwise of the matter.

As we pointed out in our colloquy with Cornell's counsel at the hearing, Cornell has raised issues that relate more to Delphi's failure to live up to the agreement as Cornell understood it, rather than whether an agreement had been reached; for example, Cornell complains that the woman Delphi hired to assist him was not helpful. Cornell's statements that the written documents did not express "what [he] agreed to" implicitly acknowledge that he did agree to settle his case. The evidence establishes that Cornell clearly understood the terms negotiated on March 18; his testimony reveals not a lack of comprehension or will regarding the settlement, but more a subsequent unhappiness with the way in which the agreement was drafted or the manner in which Delphi has carried out its obligations under the agreement.

Cornell testified that he does not consider himself incompetent, and neither do we. He drove himself to court on the day of the hearing and appeared alert and intelligent, especially when discussing his work at Delphi. The evidence shows that he is

---

**4.** At the hearing, the parties did not address whether the waiver provisions of the Older Workers Benefits Protection Act (OWBPA), which amended the Age Discrimination in Employment Act (ADEA) in 1991, applies to Cornell's release of his age discrimination claims, probably because Cornell's claims center around disability discrimination; the parties' failure to focus on age discrimination claims at the settlement conference and the enforcement hearing further establishes the peripheral nature of the age claims. However, the record clearly reflects that Cornell understood that his waiver encompassed *all* claims except those relating to patents. That his waiver was knowing and voluntary is

clear not only from the circumstances of the court-supervised settlement conference and representation of counsel, but by what all who were present agree was Cornell's high level of participation at the conference, including his insistence upon retaining the right to bring patent claims against his employer. His provision for the patent exception indicates he knew he was waiving all claims, including age discrimination, against Delphi. Moreover, the Supreme Court case of *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S.Ct. 838, 843–44, 139 L.Ed.2d 849 (1998) (Breyer, J., concurring) indicates that a non-complying release would not be void, just voidable, as to age claims.

fully capable of living, and does live, a high-functioning, normal, productive life. We doubt that an incompetent person could have arranged a trip and traveled to California to see his doctor, as Cornell recently has done.

To the extent that he "shuts down" when he feels threatened or pressured or demeaned, Cornell explained that his trouble arises in explaining himself and expressing his thoughts. Although his medication reportedly controls this to a large degree, he may always experience some symptoms of his disability. We find that, under the totality of the circumstances, any trouble Cornell encountered in communicating at the settlement conference on March 18 was not nearly enough to render his consent to the agreement unknowing or involuntary, particularly in light of the fact that he was assisted by his counsel throughout. There is no evidence, including the deposition testimony of Cornell's physician, to suggest that Cornell's intelligence was impaired that day. As noted above, Cornell is well-educated and has many years of highly skilled work experience at Delphi. His level of input into the settlement was by all accounts "very high," he had many hours on March 18 to deliberate on the proposed settlement with the advice of his attorney, the pace was sufficiently structured and the meeting protracted to such an extent that he could not have been under unabated pressure to decide or to perform throughout the meeting, he had ample opportunity to consider the terms and read the agreement before signing, and there was no evidence that anyone involved in the conference behaved improperly towards him; in fact, to the contrary. Cornell understood at the time he agreed to the settlement that he was giving up all of his claims related to the lawsuit, as well as any other claims he had against Delphi, which was why he specifically asked that an exception be made for the patent claims—he did not want to release those, and he in fact retains the right to bring patent-related claims against Delphi even now.

It may be that Cornell was not as articulate as he wanted to be in ensuring that all of the details were included in Judge Shields' written agreement, but we cannot find that Cornell lacked an understanding that he was waiving his remaining, non-patent-related claims or a comprehension of what he would receive in return.

*Conclusion*

For the reasons stated above, Defendant Delphi's Motion to Enforce Settlement Agreement is GRANTED. The revised agreement submitted by counsel for Defendant in the wake of the hearing shall be enforced. The agreement provides that the terms of settlement remain confidential, and it is therefore ORDERED that the Clerk of the Court file the tendered Order Enforcing Settlement Agreement as of the date of this Entry and maintain it under seal.