In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 24-1517

BRIAN J. MURPHY,

*Plaintiff-Appellant,*

*v.*

CATERPILLAR INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:21-cv-01282-JES-JEH — **James E. Shadid,** *Judge.*

---

ARGUED DECEMBER 4, 2024 — DECIDED JUNE 18, 2025

---

Before HAMILTON, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In this appeal, evidence conflicting with an employer's stated justifications for adverse employment action permits a reasonable inference of pretext and unlawful intent. Plaintiff-appellant Brian Murphy alleges that his former employer, Caterpillar Inc., constructively discharged him based on his age and his prior assertions of his rights in violation of the Age Discrimination in Employment

Act of 1967 (ADEA), 29 U.S.C. § 623(a). The district court granted summary judgment for Caterpillar.

We reverse on Murphy's age discrimination claim but affirm on his retaliation claim. Murphy presented sufficient evidence for a reasonable jury to find constructive discharge. Caterpillar placed him on a performance action plan written so that he had already failed, and it then refused to amend the plan when he pointed out that flaw. Murphy also offered evidence that his performance history over decades, including his most recent review, contradicted Caterpillar's stated rationale for the adverse action—namely, that his performance was substandard. Murphy also presented evidence that Caterpillar offered inconsistent explanations for the adverse action, which also supports a reasonable inference of pretext. Caterpillar may ultimately persuade a jury that its reasons for implementing the performance action plan were not discriminatory, but the case calls for trial on that issue rather than summary judgment. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (evidence of pretext permits inference of unlawful discrimination).

On Murphy's retaliation claim, more than a decade passed between his protected activity and the adverse employment action. That makes any causal connection implausible, and the record contains no evidence of retaliatory animus. Also, key Caterpillar managers had an earlier opportunity to retaliate against him if they had been so inclined but did not do so. On this record, no reasonable jury could find that Caterpillar unlawfully retaliated against Murphy.

I.  *Factual and Procedural History*

We set forth the relevant facts through the summary judgment lens, construing the evidence in the light most favorable to Murphy as the non-moving party. E.g., *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009). To survive summary judgment, a party must point to specific facts showing that there is a genuine issue for trial. *Id.* at 406–07.

A.  *Murphy's History with Caterpillar*

Plaintiff Murphy was born in 1959 and was 58 years old when his employment with Caterpillar ended. He began working for Caterpillar—a manufacturer of construction and mining equipment, engines, turbines, and locomotives—in 1979, at the age of nineteen. During his first fourteen years working for Caterpillar, he obtained an engineering degree and was promoted to Senior Design Engineer.

In August 2000, Murphy and several other engineers—all then over the age of 40—were passed over for promotion. Murphy complained that he was not promoted because of his age and was later placed on a performance action plan. In November 2000, Caterpillar fired him. Murphy sued Caterpillar for age discrimination and unlawful retaliation. The court granted summary judgment for Caterpillar on the age discrimination claim, but the retaliation claim went to trial. A jury found in Murphy's favor and awarded him double his lost wages. The district court ordered Caterpillar to reinstate Murphy. In January 2005, Murphy and Caterpillar settled that case on terms that reinstated Murphy and included a promise from Caterpillar not to retaliate against him.

In 2008, Murphy was promoted to a leadership role in Caterpillar's Sound Program, an engineering team focused on reducing engine noise. From 2010 through January 2013, Murphy reported directly to Jim Sibley. Then, in January 2013, Matthew Rampenthal became Murphy's supervisor. At some point in 2013—the record does not specify exactly when—Sibley told Murphy that he was aware of his earlier lawsuit. Around the same time, Sibley also informed Rampenthal of the previous litigation.

Rampenthal appeared satisfied with Murphy's performance and conduct. From 2013 to 2017, Murphy's performance reviews consistently indicated that he either met or exceeded expectations.

In late 2015, Caterpillar introduced a voluntary retirement program offering a severance package and additional retirement benefits to employees aged 55 and older who chose to retire. At 56 years old, Murphy was eligible but decided not to retire at the time. In early 2016, Caterpillar management asked Murphy to lead efforts to reduce sound in a new engine model. He accepted the assignment while continuing to fulfill his existing responsibilities as a "Job Owner Lead." Driven by Murphy's leadership and technical expertise, the sound reduction project was completed in late 2017 and was praised in Caterpillar's internal communications.

B.  *Caterpillar Takes Action Against Murphy*

In mid-January 2018, shortly after successful completion of the engine sound reduction project, managers seemed to turn against Murphy. Rampenthal met with Heather Huber from Caterpillar human resources and told her that Murphy's performance had declined and that he was not working the

expected number of hours. Rampenthal asked Huber to document Murphy's time spent at Caterpillar's offices from October 2017 to February 2018.

On March 8, 2018, Murphy met with Rampenthal to discuss his 2017 final performance review. Murphy met or exceeded expectations in every evaluation category. But about a week later, on March 16, Rampenthal and Huber told Murphy that he would be placed on a performance action plan. Rampenthal and Huber presented PowerPoint slides to Murphy outlining several areas of concern, including his job performance, attendance, interpersonal relationships, and leadership style.

On March 26, 2018, Murphy met with Rampenthal and Huber to review the proposed action plan. The action plan outlined several areas for improvement based on alleged changes in Murphy's performance over the preceding three months, including the issues addressed in the PowerPoint presentation. The plan also stated that Murphy's "failure to successfully complete and sustain improvement on the action item(s) listed above could result in reassignment, demotion, and/or disciplinary action, up to and including separation." The next day, Rampenthal sent Murphy a copy of the plan and asked him to identify any concerns by March 28.

On March 28, Murphy emailed Rampenthal and Huber with his reservations regarding the action plan. Most relevant for this appeal, Murphy objected that the deadline for one action item had already passed. That meant he was already in violation of the plan as written. The following morning, though, Huber told Murphy that she and Rampenthal would "not be changing any part of the action plan." On March 29, Huber delivered a copy of the final action plan to Murphy. It

was identical to the proposed plan. Also important to this appeal, Huber, Rampenthal, and Rampenthal's supervisor had already signed the portion of the plan indicating with their signatures that Murphy had failed to meet its requirements. Believing that putting him on a performance action plan that he had already violated was merely a pretext for his termination, Murphy refused to agree to its terms. He submitted his notice of retirement on April 2, 2018.

Murphy then filed this suit. Following discovery, the district court granted summary judgment for Caterpillar on all claims. *Murphy v. Caterpillar Inc.*, 2024 WL 520020 (C.D. Ill. Feb. 9, 2024). Murphy has appealed, and we have appellate jurisdiction under 28 U.S.C. § 1291.

II. *Rampenthal's "Desk Notes"*

Before turning to the merits, we first address an evidentiary issue that can arise in many employment discrimination cases, when a manager keeps a plaintiff-specific log of observations and criticisms. In this case, Caterpillar supported its motion for summary judgment with a collection of Rampenthal's personal notes—referred to as his "desk notes"—about Murphy. In opposing summary judgment, Murphy challenged the admissibility of the notes. He repeated his objection in his post-judgment motion under Federal Rule of Civil Procedure Rule 59(e) and on appeal.

Evidence supporting and opposing a motion for summary judgment must be admissible in the same manner as at trial, except that parties may rely on sworn declarations in lieu of live testimony. See *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017), citing Federal Rule of Civil Procedure 56(c)(2); *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014);

*Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). Rampenthal's desk notes critical of Murphy fit the definition of hearsay: they contain out-of-court statements offered for the truth of their contents—namely, that Murphy failed to meet Caterpillar's performance expectations in various ways. See Federal Rule of Evidence 801(c). Accordingly, the desk notes are inadmissible unless they fall within a recognized exception to the hearsay rule.[1]

Caterpillar defends the district court's reliance on the notes based on the business records exception to hearsay in Federal Rule of Evidence 803(6). We conclude that Rampenthal's notes do not meet the requirements for the business records exception. Rule 803(6) excepts from the rule against hearsay:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
> > (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

---

[1] In its text-only order denying Murphy's Rule 59(e) motion, the district court did not analyze the admissibility of the desk notes under any specific exception to the hearsay rule. Instead, in denying the motion, the court appeared to rely on Rampenthal's sworn declaration, which it characterized as attesting that the desk notes were "true and correct." To be sure, a hearsay objection can be overcome if a witness testifies in court or in an affidavit on summary judgment so as to adopt the truth of the out-of-court statement. The problem here is that the court's description of the Rampenthal declaration was not accurate. He testified only that the desk notes were true and correct *copies* of the originals—not that the contents of the notes were in fact accurate.

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

"To be admissible as a business record, a document must have sufficient indicia of trustworthiness to be considered reliable." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Indicia of trustworthiness include factors such as systematic checking, habits of precision on the part of the keeper, reliance by others on the records, or a duty to record accurately. 5 Weinstein's Federal Evidence § 803.08 (2025).

Typically, "to demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records." *Woods*, 234 F.3d at 988. Such an

affidavit is generally required unless limited exceptions apply—for example, where the opposing party has previously relied on or conceded the accuracy of the records. *Id.* at 988–89. Caterpillar does not argue that any such exception applies here.

Caterpillar instead argues that the notes are admissible because Rampenthal "properly laid a foundation to establish that his desk notes are business records." In support, it relies primarily on *Komal v. Arthur J. Gallagher & Co.*, 833 F. Supp. 2d 855, 864 (N.D. Ill. 2011), where the district court granted in part an employer's motion for summary judgment in an employment case. The court relied on hearsay statements found in emails, meeting memoranda, performance evaluations, corporate policies, and disciplinary records under the business records exception. *Id.* at 859–60.

We do not disagree with *Komal*, but its treatment of that evidence does not apply to the desk notes here for two reasons. First, the documents admitted in *Komal* were accompanied by an affidavit from a qualified affiant who attested that they were either drafted by him or "created in the normal course of business overseen by him." *Id.* at 859. Rampenthal's declaration in this case lacks such a statement. This is especially important because it is not self-evident from the documents that they were created in the regular course of business. To the contrary, it appears that Rampenthal made these desk notes only with reference to Murphy and the specific occasions when Murphy reported to him. Rampenthal's declaration said: "While Murphy reported to me, I took contemporaneous notes regarding meetings, incidents and discussions I had with Murphy and others regarding Murphy's employment…." Second, the plaintiff in *Komal* "admitted nearly all of

the factual allegations based on those documents," even where the documents themselves lacked accompanying affidavits. *Id.* In contrast, Murphy has expressly disputed the assertions regarding his performance in Rampenthal's desk notes.

The hearsay evidence here is far more like the evidence excluded in *Jones v. Board of Trustees of Community College Dist. No. 508*, 75 F. Supp. 2d 885 (N.D. Ill. 1999). There, the defendant-employer filed a motion in limine seeking to enter into evidence a supervisor's notes regarding the plaintiffs' performance. The district court found that the notes did not meet the criteria for the business records exception. The employer failed to demonstrate "that making personal file notes about employees' performance was a regularly conducted business practice or that such evaluations were recorded as a matter of regular practice." *Id.* at 888–89. Accordingly, the court reasoned: "The memoranda were 'not created with the kind of regularity or routine which gives business records their inherent reliability….'" *Id.* at 889, quoting *Pierce v. Atchison Topeka & Santa Fe Railway Co.,* 110 F.3d 431, 444 (7th Cir. 1997).

The notes in *Jones* simply did not have indicia of reliability required for the business records exception. The supervisor's notes were "not systematically checked by anyone else; nothing indicates that he has any special habits of precision or that anyone else relied on these records; and he was under no duty to record that information accurately." *Id.* Instead, the circumstances suggested that the supervisor may have had an incentive to create a favorable record in preparation for litigation, potentially undermining the reliability of the notes.

Similarly, here, Caterpillar has not shown that Rampenthal regularly took notes on other employees besides Murphy.

As with the notes in *Jones,* no evidence suggests that Rampenthal (or any other Caterpillar employee) systematically checked his notes for accuracy. Nor is there evidence that Rampenthal had special duties or habits of precision or that anyone else within Caterpillar relied on his notes to make decisions. There is no sign of any other internal mechanism that would ensure these records were accurate.

The reasoning of *Jones* on this issue is consistent with our decision in *Pierce v. Atchison Topeka & Santa Fe Railway Co.*, supra, which the *Jones* court cited. In *Pierce*, the district court held that a memorandum prepared by the plaintiff's supervisor summarizing a meeting during which the plaintiff accepted a severance package and signed a release relinquishing any claims against his former employer did not qualify as a business record. 110 F.3d at 444. We affirmed on grounds that apply here. The supervisor testified that he maintained personnel files in the ordinary course of business and that he drafted memoranda to document unique interactions with employees. However, he also conceded that it was not customary for him to draft such memoranda. Despite arranging "six or eight" comparable releases, he had never drafted a similar memorandum in connection with execution of a severance agreement. *Id.*

We affirmed because the district court's exclusion "was sensitive to the concerns embodied in Rule 803(6)" as the supervisor's memorandum "was not created with the kind of regularity or routine which gives business records their inherent reliability." *Id.*, quoting with approval the district court's ruling on the issue. The district court did not abuse its discretion when it determined that the memorandum was meant "to memorialize an unusual incident … that [the supervisor]

may have been concerned could have some litigation potential to it." *Id.*, again quoting the district court's ruling.

The record here offers even stronger grounds for rejecting the business records exception than in *Pierce*. In *Pierce*, the supervisor at least testified that he occasionally drafted similar memoranda in the course of his duties. 110 F.3d at 444. Here, there is no evidence that Rampenthal regularly took notes about other employees or that he took them in years other than 2013 and 2018. Without a more substantial showing of regular practice and reliability, the desk notes are not admissible as business records. See, e.g., *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984) (affirming district court's refusal to admit audit reports under Rule 803(6): "The irregular frequency and nature with which the audits were conducted also precludes their classification as business records of the Employer."). This lack of regularity is not saved by any other indicia of trustworthiness. See *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 628 (1st Cir. 1988) (recognizing that non-routine business records may be admissible under Rule 803(6) if they meet rule's other requirements and attendant circumstances do not indicate a lack of trustworthiness).

As in *Pierce*, it is plausible that Rampenthal may have prepared his desk notes with an eye towards potential litigation, especially because he began taking them in 2013, after learning of Murphy's previous lawsuit against Caterpillar. See *Palmer v. Hoffman*, 318 U.S. 109, 113–14 (1943) (rejecting admission of railroad accident reports as business records because their "primary utility [was] in litigating, not in railroading"). In any event, Rampenthal's notes are no more business records than an employee's personal diary recording grievances

against management. See, e.g., *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000) (reports of employee's complaints about boss and employee's diary were not admissible as business records); see also *Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998) (employee's diary was inadmissible hearsay that also could not be admitted as past recollection recorded under Rule 803(5)).

So as the record stands, Rampenthal did not attest to the truth of the contents of the desk notes in his declaration, Murphy has contested their accuracy, and the record does not otherwise support their reliability. The desk notes are thus inadmissible hearsay. As a result, the district court improperly relied on the notes in granting Caterpillar's motion for summary judgment. Though the district court cited the desk notes extensively in its ruling, we do not need to separate all the wheat from all the chaff here. Independent grounds for reversal on Murphy's age discrimination claim exist, which we turn to now.

## III. *Age Discrimination*

An ADEA plaintiff may proceed by introducing direct or circumstantial evidence that he suffered an adverse employment action because of his age. *Carson v. Lake County*, 865 F.3d 526, 532–33 (7th Cir. 2017). A plaintiff may also proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); see also *Carson*, 865 F.3d at 533 (explaining that these are alternative routes). To set forth a prima facie case of age discrimination under the burden-shifting approach, a plaintiff must show "(1) he was over forty years of age; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated, substantially

younger employees were treated more favorably." *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir. 2002). If the plaintiff has established this prima facie case, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016), quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). From evidence of pretext, a trier of fact may, but is not required to, infer the employer acted with an unlawful motive. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

We pause on this point for a moment to clarify the significance of evidence of pretext under *McDonnell Douglas*. The district court here quoted our decision in *Bless v. Cook County Sheriff's Office*, 9 F.4th 565 (7th Cir. 2021): "What's more, 'a showing of pretext alone is not enough; the plaintiff must also show that the explanations are pretext for the prohibited animus.'" *Id.* at 573, quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013), citing in turn *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). Those statements are correct but can be easily misunderstood. In *St. Mary's Honor Center*, the Supreme Court made clear that a showing of pretext is sufficient to *permit* an inference of unlawful discrimination. 509 U.S. at 511. The Court also made clear that "[n]o additional proof of discrimination is *required*." *Id.*, quoting with approval and adding emphasis to *Hicks v. St. Mary's Honor Center*, 970 F.2d 487, 493 (8th Cir. 1992) (decision under review).

Accordingly, our statements in *Bless* and *Hitchcock* and other cases to the effect that the plaintiff must "also show that the explanations are a pretext for the prohibited animus" should not be understood to require additional evidence from a plaintiff, such as some further indication of unlawful animus. Pretext does not require an inference of unlawful animus, but it does *permit* that inference. This principle means that when a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied. E.g., *Vichio v. US Foods, Inc.*, 88 F.4th 687, 694–95 (7th Cir. 2023) (reversing summary judgment; employer's dishonest explanation for adverse action is sufficient to permit inference of unlawful motive), citing and quoting *Runkel v. City of Springfield*, 51 F.4th 736, 745 n.3 (7th Cir. 2022) (reversing summary judgment; plaintiff who shows pretext need not offer additional evidence of unlawful intent), and *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 932 (7th Cir. 2020) (reversing summary judgment); *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir. 1990) (reversing summary judgment; pretext permits inference of unlawful motive, and "if the inference of improper motive *can* be drawn, there must be a trial").[2]

Regardless of the plaintiff's chosen method(s), at the summary judgment stage the court must consider all admissible

---

[2] When a case gets to trial, we have explained, jurors need not and probably should not be instructed on the intricate steps of the *McDonnell Douglas* test. Instead, jurors should be instructed that the ultimate question they must decide is whether the employer in fact acted with the unlawful animus. See *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994) (leaving for argument by counsel inferences to be drawn from evidence of pretext); see generally *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016) (clarifying standards and methods for proof of employment discrimination).

evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of his age. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (explaining that the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action. Evidence must be considered as a whole….").

With respect to his claim for age discrimination, Murphy proceeds under *McDonnell Douglas*. The parties agree that Murphy, at age 58, was a member of the class protected by the ADEA but disagree as to all of the remaining elements of *McDonnell Douglas*. We first consider whether Murphy was subjected to an adverse employment action.

A. *Constructive Discharge as Adverse Action*

Constructive discharge amounts to an adverse employment action. *E.E.O.C. v. Univ. of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002). The district court found, and we agree, that Murphy presented sufficient evidence for a reasonable jury to conclude that he was constructively discharged. *Murphy*, 2024 WL 520020, at \*9. Relevant to this appeal, a plaintiff can demonstrate constructive discharge by showing that he was forced to resign because his working conditions were made "'so intolerable that a reasonable person would have felt compelled to resign.'" *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022), quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). In other words, constructive discharge occurs where, based on an employer's actions, "the handwriting [was] on the wall" and the proverbial axe was about to fall. *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998).

To be clear, though, Caterpillar's decision to place Murphy on a performance action plan—absent any reduction in pay or imposition of other adverse employment conditions—would on its own not be sufficient to establish constructive discharge. See *Fields v. Board of Educ. of City of Chicago*, 928 F.3d 622, 625–26 (7th Cir. 2019) (affirming summary judgment for employer because negative performance reviews and performance action plans did not constitute constructive discharge: "initiating disciplinary procedures does not necessarily mean that an employer is preparing to fire an employee because the employer could, for example, hope that criticism will lead to better performance by the employee"); *Davis v. Time Warner Cable of Southeastern Wisc., L.P.*, 651 F.3d 664, 670, 677 (7th Cir. 2011) (holding that performance action plan which increased employee sales quotas and reduced potential commissionable transactions did not constitute adverse employment action: "Performance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions."); *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009) (holding that performance action plan that did not deprive employee of "responsibility, hours, pay, or any other relevant accoutrement of her position" by itself did not constitute adverse employment action).

In this case, however, Caterpillar's performance action plan for Murphy was quite unusual. Like many performance action plans, Caterpillar's plan warned that failure to complete it successfully could result in termination. Unlike other plans, however, this plan imposed a deadline that had already passed. Murphy was already in violation of its requirements from the outset. That oddity cannot be explained away as an inadvertent oversight. When Murphy raised the obvious problem and asked for a modification, Huber and

Rampenthal refused to make any change. Moreover, Huber and Rampenthal both signed the plan in a box labeled "Did Not Meet Action Plan" before Murphy had even accepted the plan's terms, let alone had an opportunity to perform under it. Though Huber later testified that company policy requires signing this section on the day the action plan is executed, it is not obvious that a jury would be required to accept the truth of such an odd policy. Moreover, Caterpillar admitted that, in the case of Murphy's coworker, Greg Atkins, "the signature block at the end of the Final Atkins Action Plan contain[ed] no signatures because Greg Atkins satisfied the terms and conditions of his plan."

Caterpillar's decision to place Murphy on a performance action plan he had already, by its terms, failed is similar to the adverse employment actions in *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987), *Green v. Town of East Haven*, 952 F.3d 394, 409 (2d Cir. 2020), and *Welch v. University of Texas*, 659 F.2d 531, 533–34 (5th Cir. 1981). In *Lopez*, the Second Circuit held that a supervisor's statement—that the employee would be terminated at the end of a probationary period regardless of performance—raised a genuine dispute as to constructive discharge. 831 F.2d at 1188. In *Green*, the court reversed summary judgment for the employer, holding that a jury could reasonably find constructive discharge where the employee was advised to resign because a mandatory procedural hearing would "almost certainly" result in her termination. 952 F.3d at 409. And in *Welch*, the Fifth Circuit concluded that a supervisor's assertion that he could no longer work with the employee, coupled with a demand to know when she would leave, created circumstances under which "a reasonable person would certainly resign." 659 F.2d at 534.

The constructive discharge analysis in these cases focused on whether an employee would reasonably conclude that continued employment was no longer viable, regardless of actual performance. Murphy's circumstances are similar, at least when viewing the evidence through the summary judgment lens. Caterpillar required him to sign a performance action plan that was impossible to complete in full, and Huber, Rampenthal, and Rampenthal's boss seemed to have signed off on his failure before the plan even took effect. To make matters worse, Caterpillar refused to revise the plan when Murphy pointed out the problem. Even if Murphy had diligently complied with the plan's remaining achievable terms, Caterpillar could still terminate him for failure to complete the plan. Requiring Murphy to sign this plan was, in effect, like a bank demanding that a borrower sign a promissory note indicating that the borrower is already in default.

Caterpillar's alleged practice of preemptively having supervisors sign performance action plans as having been failed reinforces our view that constructive discharge turns on genuine issues of fact. Caterpillar appears to claim that, pursuant to its internal policy, action plans are designated as failures by default until they are completed in full. Upon completion, the story goes, the failure designation would be rescinded and any associated signatures would be removed. We do not express an opinion on this unusual supposed policy other than to say we do not think a jury would be required to believe the story on this record. Caterpillar has presented no evidence that any other employee's performance action plan was treated similarly. The only other performance action plan in the record, that of Greg Atkins, lacks comparable signatures or any indication they were removed as Caterpillar claims. A reasonable jury could find that the evidence about this

supposed practice—marking Murphy's plan as failed before it had even begun—signaled to Murphy that his fate had been decided.

To borrow the language from *Lindale*, the handwriting may not have been on the wall, but it was certainly etched into the signature block of the action plan, and the axe was poised to fall because Murphy was already in breach of the plan's terms. See 145 F.3d at 956. A reasonable jury could find that Murphy's termination was a foregone conclusion. Accordingly, there exists a genuine dispute of material fact as to whether Murphy was constructively discharged. For purposes of summary judgment, we must accept that he suffered an adverse employment action.

B. *Caterpillar's Justification and Comparators*

Caterpillar justifies its adverse employment action by asserting that Murphy was failing to meet its legitimate performance expectations. It also argues that Murphy has failed to establish that his chosen comparators were similarly situated because, unlike Murphy, they were meeting Caterpillar's legitimate performance expectations. See *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories"). As a result, the question whether Murphy was meeting Caterpillar's legitimate expectations merges with the question whether Caterpillar's reasons for taking adverse employment action against Murphy were pretextual. In such cases where the issue of meeting legitimate job expectations and the question of pretext overlap, we may skip a sequential *McDonnell Douglas* analysis and turn directly to pretext. *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022).

C. *Pretext*

To say that an employer's justification is a pretext means to say that it is "a lie, specifically a phony reason for some action." *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023), quoting *Chatman v. Board of Educ. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021). We have also described pretext as "'deceit used to cover one's tracks.'" *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002), quoting *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001). To meet his burden, Murphy "'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the employer's asserted 'reasons that a reasonable person could find it unworthy of credence.'" *Marnocha v. St. Vincent Hosp. & Health Care Center, Inc.*, 986 F.3d 711, 721 (7th Cir. 2021), quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

We have said repeatedly, however, that the court is not a "super personnel department that second-guesses employers' business judgments." *Riley v. Elkhart Community Schools*, 829 F.3d 886, 895 (7th Cir. 2016), quoting *Millbrook*, 280 F.3d at 1181. Our focus "is not on the wisdom of the decision" to take adverse employment action "but on its genuineness." *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024). And at the risk of repeating ourselves, evidence of pretext does not require but does permit an inference of unlawful motive, meaning that summary judgment should be denied and the ultimate question of motive given to the trier of fact to decide. *St. Mary's Honor Center*, 509 U.S. at 511; *Vichio*, 88 F.4th at 694–95; *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 303 (7th Cir. 1996).

We have long held that an employer's shifting and inconsistent explanations for an adverse employment action can

support an inference of pretext. See *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext.").

A reasonable jury could find Caterpillar's justifications for taking adverse employment action against Murphy pretextual, as its explanations for placing him on a performance action plan—especially one he began in default—are difficult to reconcile with other evidence of his satisfactory performance. Caterpillar, through Rampenthal, claimed that the action plan was triggered by deficient performance. However, throughout his decades-long career at Caterpillar, Murphy always received performance evaluations indicating that he met or exceeded expectations. Most notably, in Murphy's performance review immediately preceding the action plan, Rampenthal rated Murphy as meeting or exceeding expectations in every category.

We found that similar suspect justifications could support a reasonable inference of pretext in *Brown v. M & M/Mars*, 883 F.2d 505 (7th Cir. 1989). There, we upheld a jury's finding of age discrimination despite evidence of deficient performance. *Id.* at 506–10. Brown's supervisor, Vincent, cited a production line shutdown as evidence of Brown's poor managerial skills and offered it as the reason for his termination. A jury rejected Vincent's explanation, concluding Brown was discriminated against based on age. On appeal, we concluded that the jury's finding was supported by the record. First, Brown introduced evidence of strong performance in the very areas his

supervisor criticized. From this, we reasoned that "there was ample evidence from which the jury could conclude that Brown was effective in the areas in which Mars asserted he was not." *Id.* at 508. Second, a draft performance evaluation prepared by Vincent just two months before Brown's termination gave him "high marks," consistent with positive assessments of his performance from other witnesses. *Id.* at 510. We reasoned that a jury could infer "that Vincent could not give Brown high marks in the areas mentioned and yet sincerely believe that Brown was the inflexible, recalcitrant manager Vincent testified he was." *Id.*

Murphy's case is similar to *Brown*, again keeping in mind the summary judgment standard. Like Brown, Murphy introduced evidence showing his positive performance. Throughout his tenure at Caterpillar, he consistently met or exceeded performance expectations, received promotions and raises, and was entrusted with greater responsibility. Indeed, just before Caterpillar put in place the performance action plan, Murphy was publicly commended for successfully leading a high-profile engine sound reduction project. Also as in *Brown*, this is not a case "where the only evidence regarding [the plaintiff's] performance was his own self-serving testimony." 883 F.2d at 509; cf. *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991) (affirming summary judgment for employer where employee denied employer's account, which was supported by evidence, but later changed her argument). Like Brown, who supported a finding of pretext by presenting a positive draft evaluation prepared by his supervisor two months before his termination, Murphy produced substantial independent evidence of his satisfactory performance. See *Brown*, 883 F.2d at 510.

The source of Murphy's favorable performance evidence makes his arguments on pretext even more compelling. In *Brown*, we found it significant that some of the "testimony about Brown's good performance came from Mars' managerial employees." *Id.* at 509. Here, Murphy's most recent and satisfactory performance review, issued just before he was placed on the action plan, came from Rampenthal himself, the same supervisor who initiated the plan.

We find further support for reversal in *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990). There, we reversed summary judgment for the employer in an age discrimination case. The company claimed it had fired Shager because "deficiencies in account management and personnel supervision dragged him below the level of expected performance." *Id.* at 401. Shager presented evidence that this criticism was "greatly exaggerated" by presenting other evidence showing "good sales performance in an unpromising territory." *Id.* On summary judgment, we concluded that the record described "a worker who like the rest of us had the weaknesses of his strength." *Id.* Because of his "zeal to sell," Shager may have failed to "attend as assiduously as he might have done to the drabber managerial aspects of his job, but his *overall* performance was outstanding…." *Id.* On that basis, we concluded that "Shager presented evidence that he was not an inadequate worker—that he satisfied the employer's legitimate expectations and therefore had not, as [his employer] contended, been fired for failing to satisfy them[.]" *Id.* at 401–02. As a result, summary judgment was inappropriate.

So too here. The thrust of Caterpillar's criticism centers on Murphy's alleged difficulty transitioning from a technically focused role to his position as a Job Owner Lead, which

requires effective delegation and team management. Yet Caterpillar has never questioned Murphy's technical expertise. To the contrary, it has repeatedly relied on that expertise—recruiting him for significant and complex engineering projects, publicly praising his technical acumen, and consistently rating his technical skills as exceeding its expectations in performance reviews. As in *Shager*, this record reflects that Murphy may possess "the weaknesses of his strength." 913 F.2d at 401. His focus on the technical minutiae of projects may have, at times, led to lapses in fulfilling managerial duties. But even in that domain, his reviews reflect at least satisfactory performance. On this record, as in *Shager*, a reasonable jury could find that the employer's justification was overstated and inconsistent with the totality of the evidence—making summary judgment improper. See, e.g., *Vichio*, 88 F.4th at 692–93 (reversing summary judgment in age discrimination case; employee's consistent record of positive performance, followed by a sudden negative evaluation, permitted inference of pretext).

In addition to the conflicts between Murphy's positive performance evaluations and the dramatic change in early 2018, another aspect of Caterpillar's explanation for placing Murphy on a performance action plan further invites an inference of pretext. In its response to the EEOC, Caterpillar asserted that Murphy's performance action plan was prompted in part by allegedly inappropriate comments made by Murphy in 2018 to two Asian coworkers. Other evidence tells a different story. Caterpillar told the EEOC that Rampenthal became aware of the alleged remark around March 13 or 14, 2018, and—together with Huber—decided to place Murphy on the action plan. Rampenthal later testified, however, that he and Huber decided to initiate the performance action plan

before learning of the alleged comments. When asked whether the decision to initiate the performance action plan occurred before the complaint about Murphy's alleged insensitive remarks, Rampenthal responded, "[b]ased on [Murphy's] performance, yes." Huber similarly testified in her deposition that the decision to implement the action plan was made on March 12, at least a day before Rampenthal allegedly learned of the insensitive remarks.

Finally, the circumstances of the performance action plan for Murphy lend further support to a finding of pretext. As discussed above regarding constructive discharge, the plan was written so that Murphy was already in default before it began. One deadline had already passed before the plan was presented to him. Then the managers refused to correct that point when Murphy raised it. And they had signed the plan in the box labeled "Signatures for Did Not Meet Action Plan." Murphy could reasonably believe the performance action plan was not proposed in good faith. What's more, a jury could also find it was not proposed in good faith, giving additional grounds for finding pretext.

Our pretext inquiry centers on whether the employer's stated reason for the adverse employment action was honestly held. Here, the record reveals conflicting accounts from Caterpillar personnel about the reasons for placing Murphy on the performance plan. Although Caterpillar told the EEOC that Murphy's 2018 comments contributed to the decision, the timeline provided by Huber and Rampenthal indicates the plan was initiated before those comments came to light. The inconsistency casts doubt on the credibility of Caterpillar's proffered reasons for Murphy's constructive discharge. Viewing the evidence in the light most favorable to Murphy, as

required on summary judgment, these discrepancies add to the case for pretext. See *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (reversing summary judgment because shifting explanations for plaintiff's firing were "sufficiently inconsistent or otherwise suspect to create a reasonable inference that they do not reflect the real reason for [plaintiff's] firing"); *Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) (reversing summary judgment for employer because defendant "gave inconsistent explanations" for employment decision that were "suggestive of pretext").

IV. *Retaliation*

Murphy also contends that Caterpillar was motivated to constructively discharge him in retaliation for his earlier lawsuit, in violation of both the ADEA and the earlier settlement agreement. Under the ADEA, it is unlawful for an employer to retaliate against an employee for opposing or complaining about age discrimination. 29 U.S.C. § 623(d). On this claim, Murphy needed to offer evidence that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a but-for causal connection between the two. *Kotaska v. Federal Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). This causal link may be established through either direct or circumstantial evidence from which a jury may infer intentional retaliation. *Greengrass v. Int'l Monetary Systems Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). The same analysis applies to his contract claim.

Murphy's earlier lawsuit, filed in 2001 and resolved in 2005, was protected activity for purposes of his retaliation claim. *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009) (parties agreed that filing discrimination lawsuit was protected activity). As discussed above, there is at least a genuine

dispute of material fact as to whether Murphy's placement on the performance action plan constituted a constructive discharge. Accordingly, on summary judgment, Murphy's retaliation claim turns on the third element of the analysis: whether he can establish a causal connection between his protected activity and the adverse employment action.

Murphy has not offered evidence sufficient to support that causal connection. To determine whether a genuine issue of material fact exists as to causation in a retaliation claim, we must consider the complete record and assess whether a reasonable jury could infer retaliatory intent. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). A plaintiff may establish this causal connection through circumstantial evidence, including but not limited to "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Gnutek v. Illinois Gaming Board*, 80 F.4th 820, 824 (7th Cir. 2023), quoting *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). Each of these categories, standing alone, may be sufficient to preclude summary judgment. See *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015).

Caterpillar contends that the lapse of time between Rampenthal's awareness of Murphy's prior lawsuit and the subsequent adverse employment action undermines any causal connection. It is generally true that an "inference of retaliation can be weakened by 'a lengthy time period between the protected activity and the alleged retaliation.'" *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017), quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014). There is no bright-line rule, however. We have recognized that even after intervals of

years, inferences of retaliatory intent may be reasonable where, for example, the alleged retaliation would have been the decision-maker's first opportunity to retaliate. E.g., *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017); *Malin v. Hospira, Inc.*, 762 F.3d 552, 559–61 (7th Cir. 2014) (collecting cases and explaining our law in this area).

In this case, the evidence of causation is too thin to allow a reasonable inference of retaliation. First, the more than ten years between Murphy's protected activity and the adverse employment action weaken any causal connection between the two events close to the breaking point. And Murphy agrees that Rampenthal, the relevant decision-maker, learned of his prior lawsuit in 2013, five years before the initiation of the performance action plan. We have previously said that such a delay renders any connection between the two events highly implausible. See *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012) ("The five-year gap [between the protected activity and adverse employment action] makes it extremely unlikely that the two events were related."). We have often found significantly shorter intervals insufficient to establish a causal link. E.g., *Leonard v. Eastern Illinois Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (affirming summary judgment; six-month gap between complaint of discrimination and adverse employment action was "too long to infer a link between the two"); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (affirming summary judgment; seven–week interval without more was not suspicious); cf. *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) (reversing summary judgment; jury could infer causation where adverse employment action occurred just four days after employee's protected speech). We must again sound a note of caution here, however. There is no bright-line rule based on a calendar. The

question is whether, in light of all the circumstances, a reasonable jury could infer retaliatory motive for the adverse action.

The substantial interval between Murphy's prior lawsuit and the protected activity substantially weakens any plausible causal connection between the two events in this case, but we pause to highlight a point that may bear on future retaliation claims. The well-established principle—that a long time between protected activity and an adverse employment action undermines an inference of causation—also applies to an employer's proffered rationale for disciplining its employee. Here, the performance action plan referred to allegedly inappropriate comments dating back to 2013—conduct for which Murphy had already completed training about prohibited harassment. A reasonable jury could view Caterpillar's reliance on years-old behavior as a tenuous justification for the disciplinary plan, potentially suggestive of pretext on Murphy's age-discrimination claim. Cf. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (affirming summary judgment where long interval between a remark and the adverse action defeated an inference of a "causal nexus between the remark and decision to discharge"). Nevertheless, in this case, additional breaks in the causal chain warrant summary judgment on Murphy's retaliation claim, even in light of some evidence of pretext.

Murphy's retaliation claim is further weakened because Rampenthal declined to retaliate against him when first presented with the opportunity in 2013. As noted, we have recognized that an employer might have a long memory when it comes to retaliation, see *Malin*, 762 F.3d at 560 (reversing summary judgment on retaliation claim), but an inference of retaliatory animus simply is not reasonable here. After learning of

Murphy's lawsuit in 2013, Rampenthal was informed by several Caterpillar employees of allegedly inappropriate comments Murphy made at work. Murphy's human resources manager recommended placing him on a performance action plan in response to the comments. Rampenthal, however, declined. He instead directed Murphy to complete anti-harassment training. Murphy did so and continued with his career for several more years, successfully, under Rampenthal's supervision. This conduct does not reflect retaliatory intent, and Murphy has provided no "evidence from which one may reasonably infer that [his] former employer waited in the weeds for five or ten years and then retaliated" against him. See *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996). To the contrary, when Rampenthal learned of Murphy's prior lawsuit and allegedly inappropriate workplace conduct, he chose a mild response, not even putting Murphy on an achievable performance action plan, as human resources had recommended. This evidence further weakens any inference of a causal connection between Murphy's lawsuit and the 2018 performance action plan. See *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (affirming Rule 12(b)(6) dismissal of employee's discrete-act retaliation claim because manager had earlier opportunities to retaliate but had not taken them).

Finally, the record lacks any additional evidence of retaliatory animus. A plaintiff may rely on circumstantial evidence such as "ambiguous statements of animus" to survive summary judgment. *Greengrass*, 776 F.3d at 486; see, e.g., *Hall v. City of Chicago*, 713 F.3d 325, 333–34 (7th Cir. 2013) (reversing summary judgment for employer on hostile work environment claim; manager's comments about slapping women suggested gender-based animus). Murphy has offered no evidence of remarks, conduct, or patterns from Caterpillar that

would support an inference of retaliatory motive. The communications in the record reflect a consistently professional tone between management and Murphy throughout the relevant period.

In sum, the years-long delay between Murphy's protected activity and the adverse employment action undercuts a reasonable inference of causation. Additionally, the undisputed evidence shows that Rampenthal passed on an earlier opportunity to retaliate, choosing instead a less harsh response to inappropriate workplace comments. Finally, Murphy has failed to offer any evidence of retaliatory animus—direct or circumstantial—that would allow a reasonable jury to conclude that Caterpillar retaliated against him based on his earlier lawsuit or in violation of the 2005 settlement agreement.

V. *Conclusion*

Caterpillar's explanations for Murphy's performance action plan—poor performance as a manager and a history of inappropriate comments at work on sex and ethnicity—may, if believed, carry the day at trial. When reviewing a grant of summary judgment, however, our role is not to weigh competing narratives. That task is for a jury. Viewing the record in the light most favorable to Murphy, a reasonable jury could infer that Caterpillar acted with discriminatory intent. However, no reasonable jury could find that Caterpillar unlawfully retaliated against Murphy. The judgment of the district court is REVERSED as to his age discrimination claim and AFFIRMED as to his claim for retaliation in violation of the ADEA and the 2005 settlement agreement. The case is REMANDED for further proceedings consistent with this opinion.