*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NATASHA ATKINSON,

         Plaintiff-Appellant,

and

TERRY ISRE'AL, BRUCE ODOM, JWAN VANEZ
RANDLE, and RANDALL TALIFARRO,

         Plaintiffs,

v

CITY OF LANSING, SAMANTHA HARKINS, and
MAYOR OF LANSING,

         Defendants-Appellees.

UNPUBLISHED
July 18, 2025
10:11 AM

No. 368528
Ingham Circuit Court
LC No. 20-000437-CZ

Before: O'BRIEN, P.J., and M. J. KELLY and KOROBKIN, JJ.

KOROBKIN, J. (*concurring in part and dissenting in part*).

I agree with the majority that plaintiff's[1] retaliation claim was properly dismissed because plaintiff has not established that she engaged in protected activity. See *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 161; 934 NW2d 665 (2019). I also agree with the majority that plaintiff has fallen short of establishing actionable race-based harassment because the incidents alleged lack the requisite severity and frequency to support a hostile work environment claim. See *Quinto v Cross & Peters Co*, 451 Mich 358, 370 n 9; 547 NW2d 314 (1996). However, I respectfully dissent from the majority's decision to affirm dismissal of plaintiff's race discrimination claim with regard to her termination. Applying the three-step *McDonnell Douglas* burden-shifting test,[2] I conclude that plaintiff has presented sufficient evidence from which a jury could infer that she was the victim of race discrimination in violation of the Elliott-Larsen Civil

---

[1] By "plaintiff," I refer to plaintiff-appellant, Natasha Atkinson.

[2] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

Rights Act (ELCRA), MCL 37.2202. Accordingly, I would reverse and remand for trial on that claim.

## A. PRIMA FACIE CASE

To begin, plaintiff has established a prima facie case for race discrimination under *McDonnell Douglas*. Under the majority's formulation, plaintiff must demonstrate that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she suffered the adverse employment action under circumstances giving rise to an inference of unlawful discrimination. See *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). I agree with the majority that plaintiff satisfies the first three elements of her prima facie case. But I would go further and hold that plaintiff has also established the fourth element.

At the outset, it is important to recognize that under *McDonnell Douglas*, a plaintiff's initial burden to establish a prima facie case is "not onerous." *Tex Dep't of Community Affairs v Burdine*, 450 US 248, 253; 101 S Ct 1089; 67 L Ed 2d 207 (1981).[3] Courts have described this requirement as " 'minimal,' " *Bucalo v Shelter Island Union Free Sch Dist*, 691 F3d 119, 128 (CA 2, 2012), quoting *St Mary's Honor Ctr v Hicks*, 509 US 502, 506; 113 S Ct 2742; 125 L Ed 2d 407 (1993), "light," *Willard v Huntington Ford, Inc*, 952 F3d 795, 808 (CA 6, 2020), and a "small showing" that is "easily made," *Kosereis v Rhode Island*, 331 F3d 207, 213 (CA 1, 2003) (cleaned up). It "is not meant to stymie plaintiffs." *Cline v Catholic Diocese of Toledo*, 206 F3d 651, 660 (CA 6, 2000). And, as the majority acknowledges, "the elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand." *Hazle*, 464 Mich at 463 n 6.

With this in mind, one straightforward way of satisfying the fourth element of the prima facie case in a termination case is to demonstrate that "the plaintiff was replaced by a person of another race." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 609; 886 NW2d 135 (2016). See also, e.g., *White v Baxter Healthcare Corp*, 533 F3d 381, 391 (CA 6, 2008); *Flowers v Troup Co, Ga, Sch Dist*, 803 F3d 1327, 1336 (CA 11, 2015); *Shackelford v Deloitte & Touche, LLP*, 190 F3d 398, 404 (CA 5, 1999); *Zimmermann v Associates First Capital Corp*, 251 F3d 376, 381 (CA 2, 2001). Plaintiff, who is Black, has established that after being terminated, she was replaced with a white employee. Under Michigan caselaw and persuasive federal caselaw, such a showing—replacement by a person of another race—is sufficient to satisfy the fourth prong of the *McDonnell Douglas* prima facie inquiry.

The majority reasons that plaintiff's prima facie case fails because she was not "similarly situated to the woman who replaced her." In my view, this analysis conflates two alternatives for satisfying the fourth element of the prima facie case. Our Supreme Court as well as federal courts

---

[3] "[I]n interpreting the ELCRA specifically, [our Supreme] Court has encouraged using as guidance federal precedent interpreting Title VII of the federal Civil Rights Act, the statute on which the ELCRA was based." *Rouch World, LLC v Dep't of Civil Rights*, 510 Mich 398, 411; 987 NW2d 501 (2022). As the majority recognizes, our courts have adopted the *McDonnell Douglas* burden-shifting test from Title VII caselaw for equivalent use under the ELCRA. See *Hazle*, 464 Mich at 463.

have recognized that the prima facie case can be established by showing that the plaintiff was replaced by a person outside the protected class *or* treated differently than similarly situated employees outside the protected class. See *Hecht*, 499 Mich at 608-609; *Wright v Murray Guard, Inc*, 455 F3d 702, 707 (CA 6, 2006); *Maynard v Bd of Regents of Univ of Fla*, 342 F3d 1281, 1289 (CA 11, 2003). Because plaintiff offered evidence that she was replaced by a white employee, she need not make an additional showing that the replacement employee was similarly situated.

All this being said, even if replacement by a white employee was not enough for the fourth element of the prima facie case, I believe that plaintiff has offered sufficient additional evidence that her termination occurred "under circumstances giving rise to an inference of unlawful discrimination." *Hazle*, 464 Mich at 462. To start, plaintiff testified that one of her supervisors, Deputy Mayor Samantha Harkins, made numerous racially insensitive comments throughout plaintiff's tenure in the mayor's office. Harkins commented that she was sexually attracted to Black men in college and that she liked the way mixed race children looked. On several occasions she also made sexual comments about Nicholas Tate, the chief administrative officer, including that "she could see the shape of [Tate's] body in his pants" and that "a white man wouldn't look as good in those jeans." Harkins also made comments about plaintiff's natural hair being "bushy and big" and that having "bushy and big" hair made it "hard to look professional," stating a preference that plaintiff straighten her hair.

In several instances throughout her seven-month stretch of employment, plaintiff testified that supervisory and management-level employees made comments to her that consistently emphasized her race. During plaintiff's job interview, Harkins told her that "we need a young Black woman in the department." When plaintiff was having tardiness issues because of changed personal circumstances, Tate took her aside to talk about her attendance, emphasizing that Black employees have to "work twice as hard" to be seen as equal to their non-Black coworkers. After plaintiff overheard a heated discussion between Harkins and a Black female employee, Dr. Joan Jackson-Johnson, the human resources and community services director, Harkins told plaintiff that "professional Black women . . . have a chip on their shoulder" and "need to learn how to get along." In addition, plaintiff was informally admonished by the head of human resources, Linda Sanchez-Gazella, regarding a comment that plaintiff had made at a staff holiday party. At the party, another staff member's husband had made sexual comments about Black women's bodies, stating that he married his white wife because he likes Black women's bodies. Plaintiff had responded "once you go Black, you can go back" as a way of handling an uncomfortable situation. Plaintiff told Sanchez-Gazella that she felt that she was being reported because of her race, and Sanchez-Gazella told plaintiff that she "would do better to learn that . . . the rules to the game are different for each player." Plaintiff took this to mean that the rules were different for her than for white employees.

Plaintiff also pointed to racially charged interactions with other employees in her testimony. Plaintiff was assigned by Harkins to proofread press releases drafted by the communications manager, Valerie Marchand, a white employee. Shortly thereafter, when plaintiff suggested to Marchand and another employee, Mark Lawrence, the citizen's advocate, that the city play more African American music from the lamp posts in downtown Lansing, Marchand complained to another employee that plaintiff was trying to tell her how to do her job. Lawrence then made a joke about playing Taylor Swift's remake of Earth, Wind and Fire's classic song, "September." After plaintiff requested a meeting with Marchand and Harkins to clear the air, Marchand left the office in tears. Harkins then told plaintiff that Marchand was from Troy and did

not have much experience interacting with Black people, and was worried that plaintiff would replace her. Rather than address the conflict, Harkins told plaintiff to continue what she was doing and not worry about it. Plaintiff says she was thereafter "iced out" by Marchand and coworkers close to her.

Other comments allegedly made in the workplace could be reasonably viewed as reflecting a dismissive approach toward Black constituents and the issues affecting them. Plaintiff testified that when she approached Mayor Andrew Schor about attending an event at a predominantly African American church on the south side of Lansing, the mayor declined, stating that "they don't vote." When plaintiff suggested to Harkins and Marchand that the mayor prepare a statement before meeting with Black Lives Matter (BLM) protesters, the mayor dismissed her suggestion. Fellow employee Lawrence made a comment that the BLM movement was a "dog without a bone." Plaintiff told him the comment was offensive and that he "should be very careful referring to Black people and animals."

Plaintiff also testified about two incidents in which her office was ransacked, with her files strewn on the floor and drawers opened, which she attributed to her involvement with the Michigan Diversity and Inclusion Council, especially her work on collecting surveys from city employees regarding their feelings about discrimination and diversity in the workplace with the goal of addressing potential changes to the city handbook. She made this inference given the timing of the incidents after her appointment as the mayor's liaison to the committee in September 2019, and her work on the diversity surveys, which were disheveled and knocked on the floor along with other belongings. Plaintiff surmised that mayoral staff knew those items were in her office because she discussed her work at the office roundtable. Plaintiff reported the incidents to Mayor Schor and Harkins, who did not investigate. While the mayor testified that some items had been knocked off his desk in the past and that perhaps the cleaning people did it, plaintiff testified that the mayor said only that his scissors were moved, which is different in kind from plaintiff's complaint—that her papers, including employee diversity surveys, were strewn about on two separate occasions. Although the majority finds that the connection between these incidents and plaintiff's race is mere conjecture insufficient to raise a genuine issue of material fact, in my opinion they should be viewed in context with the other goings-on, and do not stand alone as plaintiff's only example of a racially tense environment.

Plaintiff has also presented evidence that would permit an inference that policies were discriminatorily enforced. When allegations of inappropriate language were made, a white employee was given the chance to respond and defend, but plaintiff was not. That is, while Tate interviewed a white city employee, David Purchase, to investigate whether he made a comment to the effect of being "tired of this Black stuff," Tate chose not to interview plaintiff to determine whether she made inappropriate comments at the state of the city afterglow party before writing a letter recommending her termination. Plaintiff also points to facts indicating that Black employees were investigated for policy violations while white employees were not. Plaintiff testified that defendants ignored her reports of inappropriate "P card" usage by a white employee, but disciplined a Black employee for the same conduct.

Of course, it would be up to a jury whether to credit plaintiff's testimony and what weight to give it in resolving "the ultimate factual inquiry [of] whether unlawful discrimination was a motivating factor in the employer's decision." *Hazle*, 464 Mich at 470. But viewing the evidence

in the light most favorable to plaintiff, as we must, I believe that these incidents, taken together, qualify as "circumstances giving rise to an inference of unlawful discrimination." *Id.* at 462. Therefore, in light of these incidents, as well as her replacement by a white employee, I would hold that plaintiff satisfied the prima facie requirements for a race discrimination claim under the ELCRA.

## B. LEGITIMATE NONDISCRIMINATORY REASONS

Because plaintiff established a prima facie discrimination case, the burden shifts to defendants to articulate a legitimate nondiscriminatory reason for the adverse employment action taken. *Major v Newberry*, 316 Mich App 527, 541; 892 NW2d 402 (2016). This is a burden of production, not persuasion. *Kilpatrick v Lansing Comm College*, 348 Mich App 44, 56; 17 NW3d 689 (2023). But the burden is to produce admissible record evidence that plaintiff was fired for the reasons stated; mere pleadings or arguments of counsel are insufficient. *Burdine*, 450 US at 255 n 9.

Here, defendants point to Tate's memorandum to Mayor Schor outlining three reasons why Tate recommended terminating plaintiff, supplemented by his deposition testimony. First, he reasoned that plaintiff improperly "discussed the suspension and a possible return from suspension of . . . Dr. Jackson-Johnson with two members of the public" at an afterglow party for the state of the city address. Tate said he had concerns that plaintiff was publicly stating that Dr. Jackson-Johnson, whom the city referred for federal investigation for alleged financial improprieties, would not be indicted and would return to work. Second, Tate's memo alleged that plaintiff also stated at the afterglow party that she wanted to start a fire in city hall and take down the administration. Third, Tate's memo alleged that plaintiff "disclos[ed] confidential information" by e-mailing the resume of a prospective employee from plaintiff's work e-mail address to her personal e-mail address. Tate wrote that he was "not aware of any legitimate purpose" behind this action and characterized it as demonstrating poor judgment compromising the applicant's personal information. In his memo, Tate recommended ending plaintiff's employment because of "these unauthorized disclosures and disparaging comments." The Tate memo satisfies defendants' burden at this second step of the *McDonnell Douglas* inquiry.

The majority points to performance-related issues as a legitimate nondiscriminatory reason articulated by defendants. I disagree that defendants have satisfied their burden of production with regard to this rationale. Although Tate, Mayor Schor, and Harkins mentioned in their testimony that plaintiff had performance issues, there is no support in the record for defendants' post hoc assertion that these concerns were causally linked to the decision to terminate plaintiff. Defendants admit that plaintiff never received formal discipline, and Tate's memo omitted any mention of performance issues. As stated above, although defendants do not have a burden of persuasion for their legitimate nondiscriminatory reason, their burden of production does require admissible record evidence and cannot rely on mere pleadings or argument of counsel. See *Burdine*, 450 US

at 255 n 9. Therefore, I would consider only the reasons in Tate's memo—and not plaintiff's alleged poor performance—as satisfying defendants' burden.[4]

## C. PRETEXT

At step three of the *McDonnell Douglas* test, "the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 134; 666 NW2d 186 (2003). A plaintiff can show pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Major*, 316 Mich App at 542 (citation omitted). "[T]hese are not the only ways that a plaintiff can show pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Miles v South Central Human Resource Agency, Inc*, 946 F3d 883, 888 (CA 6, 2020) (cleaned up). Summary disposition "is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual." *George v Youngstown State Univ*, 966 F3d 446, 462 (CA 6, 2020).

Turning to the three reasons advanced in Tate's memo, there is a question of fact about whether the first two—plaintiff's alleged statements about Dr. Jackson-Johnson and about burning down city hall—were "the actual factors motivating the decision." *Major*, 316 Mich App at 542. Although these two reasons were mentioned in Tate's memo, Tate made clear in his deposition that the animating reason behind the termination decision was the third reason, plaintiff's alleged disclosure of confidential information by e-mailing a prospective employee's resume to herself. Tate testified that he began to informally investigate the first two reasons but stated that his discovery of the e-mail—the third reason—was what "formed the basis of my decision."

To the extent that Tate does rely on the first two reasons, there remains a question of fact as to pretext given how Tate conducted his investigation. "Demonstrating pretext often consists of raising the question of why the plaintiff was singled out for an adverse employment action." *Strickland v Detroit*, 995 F3d 495, 512 (CA 6, 2021) (cleaned up). Tate admitted that when a white employee, Purchase, had been accused of making a racially inappropriate statement, Tate had interviewed Purchase to get his side of the story and did not take any action against him because "I've got two different stories and nothing to corroborate either one." By contrast, he did not ask plaintiff whether she had made the statements about Dr. Jackson-Johnson or burning down city hall (she denies making any such statements), and he acknowledged that he was unable to

---

[4] For similar reasons, I would not consider plaintiff's communication with Dr. Jackson-Johnson, who was under federal investigation, as satisfying defendants' burden. According to plaintiff's testimony, Tate asked plaintiff to speak with Dr. Jackson-Johnson, with whom plaintiff had a personal relationship, to encourage her to cooperate with the investigation. Although defendants argue in their brief that in doing so it was improper for plaintiff to have warned Dr. Jackson-Johnson that she could be suspended if she did not cooperate, there is no indication in Tate's memo, his deposition testimony, or elsewhere in the record that defendants knew about this communication, considered it inappropriate, or relied on it to support their decision to terminate plaintiff's employment.

corroborate that she had made them. To the extent that Tate treated plaintiff differently and less favorably than Purchase (an employee of another race) when both were accused of making inappropriate statements, plaintiff raises a question of fact about whether "the employer fire[d] the employee for the stated reason or not." *Miles*, 946 F3d at 888 (cleaned up).

That brings us to the third reason in Tate's memo, which Tate characterized as an "unauthorized disclosure of confidential information." The record reflects that Mayor Schor had forwarded a prospective employee's resume to plaintiff when he asked her to schedule a job interview with the applicant. Tate acknowledged that the alleged "disclosure" at issue was merely plaintiff e-mailing that same resume to herself—from her work e-mail address to her personal e-mail address. According to plaintiff, she e-mailed the resume to herself so she could prepare notes or talking points for the mayor over the weekend to prepare for the interview. Furthermore, plaintiff points out that the resume was likely not confidential, as it was accessible on the applicant's LinkedIn profile page. Additionally, Harkins told plaintiff that plaintiff's own resume was shared within the office before she began work, which further undermines the notion that the potential hire's resume was a confidential document to which plaintiff should not have had access. Viewed in the light most favorable to plaintiff, this evidence raises substantial questions of fact about whether plaintiff's alleged misconduct—essentially e-mailing a document to herself—was truly "sufficient to justify the decision" to fire her. *Major*, 316 Mich App at 542. In my view, a reasonable juror could conclude that it was not, but was instead pretext.

The majority, in concluding otherwise, states that plaintiff points to nothing other than her subjective belief that race played a part in the decision to terminate her. Although I agree that a subjective belief is insufficient to sustain a claim for race discrimination, the key function of the *McDonnell Douglas* burden-shifting test is to allow race discrimination claims to proceed when direct evidence of discrimination is lacking but evidence of pretext has been presented. The plaintiff in a race discrimination case has "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff" on the basis of race, *Burdine*, 450 US at 253, but once a prima facie case is established the jury is ordinarily permitted to infer the unlawful motive from evidence of pretext, *Hicks*, 509 US at 511. See also *Reeves v Sanderson Plumbing Prod, Inc*, 530 US 133, 146-149; 120 S Ct 2097; 147 L Ed 2d 105 (2000). The jury can also consider evidence that was marshaled in support of the prima facie case, but "no additional proof of discrimination is required." *Hicks*, 509 US at 511 (cleaned up). As the Seventh Circuit Court of Appeals recently put it: "Pretext does not require an inference of unlawful animus, but it does permit that inference. This principle means that when a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied." *Murphy v Caterpillar Inc*, 140 F4th 900, 911 (CA 7, 2025). I believe that it is appropriate to apply the same principle here. Plaintiff's evidence of pretext—together with the evidence of her prima facie case which includes numerous alleged instances of race discrimination in the workplace—is sufficient to satisfy the third step of the *McDonnell Douglas* inquiry.

* * *

To summarize, because plaintiff has made a prima facie showing of race discrimination and has cast doubt on the employer's proffered reasons for the adverse employment action, I would hold that plaintiff has raised a genuine issue of material fact as to whether discrimination was a

motivating factor in the employer's decision. See *Hazle*, 464 Mich at 466. I would therefore reverse and remand this claim for submission to a jury, so I respectfully dissent in part.

/s/ Daniel S. Korobkin